VIKING PUMP, INC., Plaintiff,

v.

CENTURY INDEMNITY COMPANY,
et al., Defendants.

Warren Pumps LLC, Third–
Party Plaintiff,

v.

Century Indemnity Company, et al.,
Third–Party Defendants.

Viking Pump, Inc., Third–
Party Plaintiff,

v.

John Crane, Inc., Houdaille Industries,
Inc., Third–Party Defendants.

C.A. No. 1465–VCS.

Court of Chancery of Delaware.

Submitted: Aug. 7, 2009.
Decided: Oct. 14, 2009.

Lisa A. Schmidt, Esquire, Harry Tashjian, IV, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware; Michael P. Foradas, Esquire, Lisa G. Esayian, Esquire, Matthew S. Buckley, Esquire, Kirkland & Ellis, LLP, Chicago, Illinois, Attorneys for Viking Pump, Inc.

John E. James, Esquire, Potter Anderson & Corroon, LLP, Wilmington, Delaware; Robin L. Cohen, Esquire, James R. Murray, Esquire, Keith McKenna, Esquire, John P. Winsbro, Esquire, Dickstein Shapiro LLP, New York, New York, Attorneys for Warren Pumps, LLC.

John S. Spadaro, Esquire, John Sheehan Spadaro, LLC, Hockessin, Delaware; Laura S. McKay, Esquire, Bruce M. Lichtcsien, Esquire, Hinkhouse Williams Walsh LLP, Chicago, Illinois, Attorneys for London Market Insurers.

Neal Levitsky, Esquire, Fox Rothschild LLP, Wilmington, Delaware; Kathleen D. Monnes, Esquire, Day Pitney LLP, Hartford, Connecticut, Attorneys for Travelers Casualty & Surety Company.

Robert M. Greenberg, Esquire, Tybout, Redfearn & Pell, Wilmington, Delaware; Amy R. Paulus, Esquire, Clausen Miller P.C., Chicago, Illinois, Attorneys for Old Republic Insurance Company.

Paul Cottrell, Esquire, Tighe & Cottrell, P.A., Wilmington, Delaware; Charles G. Carluccio, Esquire, Colliau Elenius Murphy Carluccio Keener & Morrow, Cranbury, New Jersey, Attorneys for The Continental Insurance Company, as successor by merger to The Fidelity & Casualty Company of New York.

Anthony G. Flynn, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; Timothy Dingilian, Esquire, Christopher Ferragamo, Esquire, Jackson & Campbell, Washington, District of Columbia, Attorneys for Granite State Insurance Company, Lexington Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA.

Thaddeus J. Weaver, Esquire, Christie Pabarue Mortensen & Young PC, Wilmington, Delaware; Kevin J. O'Connor, Esquire, Peter C. Netburn, Esquire, Hermes, Netburn, O'Connor & Spearing, P.C., Boston, Massachusetts, Attorneys for OneBeacon America Insurance Company, XL Insurance America, Inc., as successor to Vanguard Insurance Company, and Republic Insurance.

James W. Semple, Esquire, Morris James LLP, Wilmington, Delaware; Karl S. Vasiloff, Esquire, Kristin Suga Heres, Esquire, Zelle Hofmann Voelbel & Mason LLP, Waltham, Massachusetts, Attorneys for Westport Insurance Corporation.

Donald M. Ransom, Esquire, Casarino Christman Shalk Ransom & Doss, P.A., Wilmington, Delaware; Brian G. Fox, Esquire, Siegal & Park, Mt. Laurel, New Jersey, Attorneys for Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America; Century Indemnity Company as successor to CIGNA Specialty Insurance Company (formerly known as California Union Insurance Company); Central National Insurance

Company of Omaha, by and through its managing general agent Cravens, Dargan & Company, Pacific Coast; and TIG Insurance Company, as successor by merger to International Insurance Company, as successor by merger to International Surplus Lines Insurance Company.

Richard M. Beck, Jr., Esquire, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, Delaware; Michael S. Komar, Esquire, Menz Bonner & Komar LLP, New York, New York, Attorneys for First State Insurance Company and Twin City Fire Insurance Company.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

In this action, Warren Pumps LLC ("New Warren") and Viking Pump, Inc. ("New Viking"), two companies that acquired businesses from Houdaille Industries, Inc., seek to use the insurance coverage that Houdaille purchased. Specifically, New Warren and New Viking own former pump manufacturing businesses that Houdaille used to own. As a result of those acquisitions, New Warren and New Viking now face potential liability due to personal injury claims made by plaintiffs alleging damages from asbestos exposure dating back to when New Warren and New Viking's businesses were owned by Houdaille (the "Houdaille–Era Claims"). To pay for the liabilities arising from the Houdaille–Era Claims, New Warren and New Viking seek to use Houdaille's insurance coverage, which includes a comprehensive insurance program of forty-five excess insurance policies (the "Excess Policies") provided by twenty different insurers (the "Excess Insurers"). Those Insurers argue that New Warren and New Viking are not entitled to use the Excess Policies.

In this opinion, I address New Warren's, New Viking's, and the Excess Insurers' cross-motions for summary judgment, which discuss whether New Warren and New Viking are entitled to exercise the rights of an insured under those Excess Policies and how liability is to be apportioned among the Excess Insurers. These issues break down a bit further into three related questions: (1) can New Viking exercise the rights of an insured under the Excess Policies?; (2) can New Warren exercise the rights of an insured under the Excess Policies?; and (3) to the extent that either New Warren or New Viking can exercise the rights of an insured, do the Excess Policies embrace the so-called "all sums" or the "pro rata" method of allocating responsibility among the Excess Insurers for the Houdaille–Era Claims that arise from asbestos exposure spanning several policy periods ("Multi–Period Exposure")?

First, I find that there is no disputed issue of material fact as to whether Houdaille assigned New Warren and New Viking the rights to use the Houdaille Policies for Houdaille–Era Claims (the "Houdaille–Era Insurance Rights" or the "Insurance Rights"). New Warren acquired its Insurance Rights through a 1985 Asset Sale Agreement by which New Warren acquired the Warren Pumps business (the "Warren ASA"). In that transaction, New Warren acquired the Warren Pumps assets along with all of the as-yet-unasserted liabilities that pertained to that business. And, through a subsequent amendment to the Warren ASA (the "Warren ASA Amendment"), Houdaille also agreed to assign New Warren the Houdaille–Era Insurance Rights so that it could cover those liabilities. That amendment can only sensibly be read as including the Insurance Rights to the Ex-

cess Policies. Thus, I find that New Warren is entitled to exercise the Insurance Rights to the Excess Policies.

New Viking's corporate history is slightly more complicated, implicating two transactions: (1) a 1985 Assignment and Assumption Agreement (the "Viking AAA") in which Houdaille transferred Viking Pump assets and liabilities to New Viking, which was then a wholly owned Houdaille subsidiary; and (2) a 1988 Stock Purchase Agreement (the "Viking Stock Agreement") in which Houdaille sold all its stock in New Viking and four other subsidiaries to IDEX Corporation. In the first transaction, Houdaille, which had previously operated its Viking Pump business as an "unincorporated" division, transferred all of that division's liabilities and all of the assets required to operate that division. In so doing, Houdaille clearly intended for New Viking to carry on the Viking Pump business, including having the duty to assume responsibility for tort claims regarding that division, which required that New Viking have access to the insurance coverage Houdaille had previously acquired to address such claims. Accordingly, the only reasonable reading of the Viking AAA is that it assigned to New Viking the Insurance Rights to the Excess Policies for pre-existing liabilities traceable to the Viking Pump business. And, I find that Viking Pump has retained the responsibility for Houdaille–Era Claims and the right to use the Excess Policies to respond to those Claims. Although the Excess Insurers use an odd provision in the Viking Stock Agreement to argue that the Houdaille–Era Claims and Insurance Rights were transferred out of New Viking back to Houdaille, a plain reading of that provision and the parties' undisputed course of performance reveals that the parties to the Viking Stock Agreement never intended to eliminate Viking Pump's access to the Insurance Rights. Therefore, New Viking now possesses the assets and liabilities attributable to the Viking Pump business.

I also reject the Excess Insurers' related argument that anti-assignment provisions within the Houdaille Policies made any assignments to New Warren and New Viking ineffective. Although the terms of those provisions state that Houdaille cannot transfer any rights under the Houdaille Policies, New York law, which governs the Excess Policies, overrides that type of policy provision in the case of post-loss assignments. Specifically, New York distinguishes between transferring coverage for events that have not yet happened and transferring coverage for liabilities that arose before the transfer. Where the underlying liability, such as for asbestos exposure, has already occurred, there is no issue of an insurer being asked to provide coverage for unanticipated events. Accordingly, to the extent that an anti-assignment provision bars post-loss transfers, it is deemed unreasonable. As a result, in a case like this one, where an insured does not transfer its insurance policies themselves, but rather just the right to collect under those policies for pre-existing liabilities, New York law will not enforce an anti-assignment provision.

Finally, I conclude that each Excess Policy is independently responsible for all of the liability that results from an occurrence during the term of the Policy's coverage, including occurrences involving Multi–Period Exposure. I apply New York law principles of insurance contract interpretation to determine that the Policies at issue require a so-called "all sums" method of allocation to determine whether particular Excess Insurers must respond to an insured's claim for coverage of liability arising from a tort plaintiff's Multi-Period Exposure to asbestos. Furthermore, the only extrinsic evidence that has been submitted favors New Warren and

New Viking's interpretation that each policy is individually liable for the full extent of liability from occurrences that span multiple policy periods. In any event, if the Policies are ambiguous, New York law requires the Excess Policies to be interpreted against the Excess Insurers who drafted those Policies.

## II. *Background*

As noted, this case involves cross-motions for summary judgment about three major issues. Although these issues involve common facts, each involves distinct facts as well. For clarity's sake, I will therefore outline the undisputed facts—as they emerge from the summary judgment record—that are relevant to all the major issues I must decide. I will then set forth the more particularized facts relevant to each distinct issue immediately before analyzing how that issue should be decided.

### A. *Houdaille, New Warren, And New Viking*

The common thread in this litigation is Houdaille Industries, an industrial conglomerate that dissolved in 1989. Houdaille was originally based in New York, where it maintained its headquarters until 1977. Afterwards, Houdaille was headquartered in Florida until 1989, when the company dissolved. During its existence, Houdaille operated a variety of distinct businesses either as unincorporated divisions or through wholly owned subsidiaries.

For current purposes, two of Houdaille's operations are of particular importance: Warren Pumps and Viking Pump.[1] Both Warren and Viking were initially independent companies that were acquired by Houdaille. Both businesses also manufacture pumps, an activity that, while those divisions were part of Houdaille, apparently involved the use of asbestos.

In the 1980's, Houdaille divested itself of all of its assets, including both the Warren Pumps and Viking Pump businesses.[2] In the case of Warren Pumps, this was accomplished in 1985 through an asset sale to New Warren.[3] Viking Pump was sold in 1987 by selling all of the stock of New Viking, which was a wholly owned Houdaille subsidiary into which the Viking Pump business had been transferred.[4] Finally, in 1989, after divesting itself of most of its assets, Houdaille transferred the remainder of its assets and some of its liabilities to John Crane, Inc.

Although I will discuss the details of the Warren Pumps and Viking Pump divestments later, it is important to note at the outset that for a generation all of the relevant parties to the divestments acted as if New Warren and New Viking had assumed the asbestos liabilities that corresponded to their businesses. New Warren and New Viking responded to asbestos claims by plaintiffs who asserted that they were injured by Viking and Warren's use of asbestos while those businesses were operated by Houdaille.[5] As a result, both New Warren and New Viking have faced numerous claims that relate to asbestos

---

1. As explained below, at various times these businesses were operated through various legal entities. Rather than identify each of those entities, I use the generic terms "Warren Pumps" and "Viking Pump" to refer to the actual businesses themselves.

2. McKay Aff. Ex. 2 at 28–29.

3. At the time, New Warren was a corporation, not a limited liability company, and was named W.P. Inc. It has since changed its name and converted to a LLC.

4. At the time, Viking Pump, Inc. was named Viking Pump–Houdaille, Inc.

5. McKay Aff. Ex. 41.

exposure during Houdaille's ownership of Warren Pumps and Viking Pump, the aforementioned Houdaille–Era Claims.[6] Since those claims were first brought in the late 1980s, Liberty Mutual, which was Houdaille's major primary insurer, has paid to defend New Warren and New Viking from and indemnify them for the Houdaille–Era Claims.[7]

### B. *Houdaille's Insurance Coverage*

The other important general concern in this litigation is the insurance coverage that Houdaille had while it owned Warren Pumps and Viking Pump. That coverage had three layers: primary liability policies (the "Primary Policies"); umbrella excess policies (the "Umbrella Policies"); and additional layers of excess coverage (the "Excess Policies," and collectively with the Primary and Umbrella Policies, the "Houdaille Policies"). Liberty Mutual provided the first two layers of insurance while the Excess Policies were provided by twenty separate insurers who issued forty-five separate policies. Although I will explain the details of these policies later, there are a few preliminary considerations that are important.

First, all of the Houdaille Policies provide what is known as "occurrence-based" coverage, which is why the policies are the subject of litigation decades after their policy period. Occurrence-based coverage means that each Policy protects Houdaille from liabilities for "occurrences" during the Policy's term (in insurance parlance, the policy's "policy period"). As discussed below, the term occurrence is itself a term of art which is informed by applicable law.

For present purposes, however, the Umbrella Policies' definition is useful as starting point. Under those Policies, an occurrence is generally defined as:

> [I]njurious exposure to conditions which results in personal injury, property damage or advertising injury or damage neither expected nor intended from the standpoint of the insured.[8]

That definition is further given meaning by the Umbrella Policies' definition of personal injury: "personal injury or bodily injury which occurs *during the policy period.*"[9] Taken together these definitions are interpreted as meaning that the Policies protected Houdaille from liability for any injury for which Houdaille was liable that occurred during the policy period.

That promise applies regardless of when the claim is asserted. So, for example, if a plaintiff suffered exposure to asbestos in 1976 and was injured by that exposure in 1976, but the injury did not manifest itself until, say, 2008, then the 1976 policy would respond to the liability, even though suit was brought a generation after the injurious exposure. The issues that arise from tort claims alleging that a plaintiff was injuriously exposed to asbestos due to Houdaille products over several years, say 1972 to 1982, are complicated and will be discussed in detail later. It suffices to say here, that the Houdaille Policies have provisions designed to address claims of those kinds.

The reason these Policies were set up in layers is because each policy has a cap on total recovery. Successive layers are triggered when the earlier layers are exhaust-

---

6. Esayian Aff. Ex. 13; O'Brien Aff. Ex. A.

7. Notaro Aff. ¶ 5; Excess Insurers' Opp. To Viking Pump Motion at 9 ("Liberty Mutual has provided defense and indemnity to Viking in connection with its asbestos-related claims for some time.").

8. *E.g.,* Winsbro Aff. Ex. 11 at LMVP01214.

9. *E.g., id.* at LMVP01199 (emphasis added).

ed. By way of a simplifying example that likely ignores certain complicating factors,[10] if Houdaille had wanted to recover for a liability that resulted from events during 1976, it would have first turned to the Liberty Primary Policy for 1976 which provided up to $500,000 in coverage. If that coverage had already been used up, Houdaille could have then turned to the next layer of policy, which would be the Umbrella Policy for 1976, which provides an additional $3 million in coverage. In the same way, if that Policy had been exhausted, Houdaille could have used the first Excess Policy for that period (the Excess Policies themselves include several layers of coverage) and then proceeded to go through the remaining Excess Policies until Houdaille had either satisfied all of its liabilities or no more coverage remained.[11]

## C. The Asbestos Claims

As noted, both New Warren and New Viking have been the subject of Multi–Period Exposure asbestos claims alleging exposure to asbestos while Warren Pumps and Viking Pump were owned by Houdaille.[12] New Viking alone has been the target of over 20,000 asbestos claims.[13] In total, Liberty Mutual has paid several million dollars in response to these claims, exhausting most of the Primary and Umbrella Policies.[14]

## D. Procedural History

In 2005, the impending exhaustion of the Liberty Mutual coverage inspired this suit. Specifically, New Viking believed that New Warren was using more than its fair share of the Houdaille Policies and brought an action against Liberty Mutual in order to apportion Liberty Mutual's coverage and preserve what New Viking saw as its equitable portion of the Policies. When Viking sued Liberty Mutual, however, Liberty chose to take a brand new and even more extreme position: that New Warren was not entitled to any of the primary coverage.

Because of the complexity of the issues involved in this litigation, the parties agreed to resolve this issue in a multistage manner. In what the parties dubbed "Phase I" of this action, they focused on the question of whether New Warren was entitled to the Insurance Rights under the Houdaille Policies to respond to the Houdaille–Era Claims. At that point in this action, the Excess Insurers were not party to these proceedings. Rather, only Liberty Mutual, New Warren, and New Viking participated, focusing on a narrow, but factually complicated issue: whether New Warren was entitled to use the Houdaille Policies, and if so which Policies.[15]

On cross-motions for summary judgment, this court determined that New Warren was entitled to use the Primary and Umbrella Policies for Houdaille–Era Claims.[16] After that opinion issued, all of the parties also agreed that New Viking had been assigned the Insurance Rights under the Houdaille Policies for Houdaille–Era Claims as well. Therefore, this court entered an order to that effect. Since

---

10. For instance, this example ignores the interplay between per occurrence limits and the aggregate limits, which cap total recovery, under the Policies.

11. Winsbro Aff. Ex. 19.

12. O'Brien Aff. Ex. A (May 5, 2009); Esayian Aff. Ex. 13.

13. Esayian Aff. Ex. 13.

14. Notaro Aff. ¶ 5; Winsbro Aff. Ex. 19.

15. See Viking Pump, Inc. v. Liberty Mutual Ins. Co., 2007 WL 1207107, at *1 (Del.Ch. Apr. 2, 2007) ("Viking Pump I ").

16. See generally id. at *1.

then, Liberty Mutual, New Viking, and New Warren have reached a global resolution of the disputes among themselves. Accordingly, this opinion does not address New Warren's and New Viking's rights to collect from Liberty Mutual under the Primary and Umbrella Policies (most of which have been exhausted).[17] That matter was resolved in favor of New Warren and New Viking being able to exercise the rights of an insured under those policies.

Instead, this opinion addresses New Warren's and New Viking's rights to use the Excess Policies for Houdaille–Era Claims.[18] In light of New Warren and New Viking's claims against the Excess Insurers, the parties have identified the following so-called "Phase II" questions: first, whether New Warren and New Viking are entitled to exercise the rights of an insured under the Excess Policies; and, second, to the extent that New Warren and New Viking have such Insurance Rights, how liability for Claims resulting from Multi–Period Exposure is to be allocated among the Excess Policies. New Warren, New Viking, and the Excess Insurers have all moved for summary judgment on the Phase II questions.

### III. *Common Legal Principles*

The three issues submitted for determination on cross-motions for summary judgment implicate many of the same legal principles. Accordingly, I begin with those common principles, first identifying the general legal standard that governs all of these motions for summary judgment, what law governs the meaning and application of the Excess Policies, and the principles of contract interpretation that apply to the various transactional documents and insurance policies.

I then turn to whether New Warren and New Viking are entitled to exercise the rights of an insured under the Excess Policies as to Houdaille–Era Claims. In that inquiry, I begin with the question of whether Houdaille agreed to assign those Insurance Rights. Then, I address whether the right to use those Policies could be assigned in the first place.

Finally, I determine how liability for Claims arising from Multi–Period Exposure is to be allocated among the various Excess Insurers.

### A. *The Legal Standard*

Under the familiar Rule 56 standard, in order to prevail on a motion for summary judgment, a party must show that there is no material fact at issue and that she is entitled to judgment as a matter of law.[19] In determining whether this burden is met, this court must view the facts in the light most favorable to the non-moving party.[20] Furthermore, under Rule 56(h):

> Where the parties have filed cross motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.[21]

Despite the extensive briefing for this motion, which totals several hundred pages over twelve separate briefs, none of the

---

**17.** Winsbro Aff. Ex. 19

**18.** The Excess Insurers were added to this suit after the completion of Phase I.

**19.** Ct. Ch. R. 56(c); *Acro Extrusion Corp. v. Cunningham*, 810 A.2d 345, 347 (Del.2002).

**20.** *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 829–30 (Del.Ch.2007).

**21.** Ct. Ch. R. 56(h).

parties has raised any material issue of fact or argued that there is an unresolved question that would preclude summary judgment. Instead, the issues in the pending motions largely turn on the interpretation of a series of agreements, the most recent of which were executed twenty years ago. For this reason, I treat these motions as submissions for judgment on the merits under Rule 56(h).

### B. *The Governing Law*

None of the Houdaille Policies contains a choice of law provision. As a result, general choice of law principles must be applied to determine what law governs the Houdaille Policies. Delaware law employs the *Restatement (Second) of Conflict of Laws*,[22] which identifies five main factors for deciding what law governs a contract that is silent on that issue:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.[23]

These contacts are not to be mechanically added up but rather evaluated in light of the individual facts and the general choice of law considerations enumerated in § 6 of the *Restatement*.[24]

In cases like these, where a company obtains insurance for risks and operations in a variety of jurisdictions, Delaware courts have placed great weight on where an insured has its headquarters as the "situs which link[s] all the parties together." [25] This judgment is reinforced by the

---

**22.** *Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.*, 394 A.2d 1160, 1166 (Del.1978).

**23.** RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971). Section 193 also creates a more specific inquiry for insurance contracts, indicating that a court should generally apply "the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy." *Id.* § 193. But, as the *Restatement* itself acknowledges, that factor is of less importance in a case like this where the "policy covers a group of risks that are scattered throughout two or more states." *Id.* § 193 cmt. b. As a result, in a case like this one, where insurance was provided for risks throughout the United States, Delaware courts apply the general choice of law considerations in § 188. *Liggett Group Inc. v. Affiliated FM Ins. Co.*, 788 A.2d 134, 137–38 (Del.Super.2001) (applying general § 188 considerations to insurance contracts that governed nationwide product liability claims).

**24.** *Hoechst Celanese Corp. v. Natl. Union Fire Ins. Co. of Pittsburgh, Pa.*, 1994 WL 721651, at *4 (Del.Super. Mar. 28, 1994). The considerations in the *Restatement* are:
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6.

**25.** *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 1991 WL 236936, at *3 (Del.Super. Oct. 29, 1991) (also noting that "[t]he constant thread which bound together Monsanto's insurance program with its insurers from beginning to end was the fact that the program was coordinated and implemented from Monsanto's corporate headquarters"); *see also Liggett Group, Inc. v. Affiliated FM Ins. Co.*, 788 A.2d 134, 137 (Del.Super.2001); *North Amer. Philips Corp. v. Aetna Cas. & Sur. Co.*, 1994 WL 555399, at *6–7 (Del.Super. Sept. 2, 1994); *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1991 WL 236943, at *2 (Del.Super. Oct. 22, 1991).

intuition that an insured's headquarters staff is typically heavily involved in the contracting, negotiation, and performance of an insurance contract.[26] In this case, Houdaille's headquarters takes on even more importance because its operations were widely spread throughout the United States. At its peak, Houdaille had several facilities in different states and therefore Houdaille's headquarters appears to be the only common link between the operations that Liberty Mutual and the Excess Insurers were insuring.

The other factors do not suggest any other contact that is nearly as strong. The Excess Insurers appear to be incorporated and have principal places of business throughout the nation. And, in a case like this one, where the insured-against injuries are spread among various states, the location of the subject matter of the contract cannot be ascribed to any single state.[27] Notably, none of the parties to this action has pointed to contacts besides Houdaille's headquarters which would indicate another, more material relationship between another jurisdiction and the Houdaille Policies as a whole.[28]

This inquiry, however, is complicated to some extent by the fact that Houdaille was headquartered in two states while it owned Viking Pump and Warren Pumps: New York until 1977 and Florida afterwards. But, Delaware courts have recognized that, in the case of a comprehensive insurance scheme made up of several different policies like the Houdaille Policies, the *Restatement* analysis should be applied to the contracts as a whole.[29] Among the general considerations that the *Restatement* counsels should govern all choice of laws analyses are "the protection of justified expectations" and "certainty, predictability and uniformity of result"—values that can best be achieved through the application of a single law.[30] If a court were to do otherwise and conduct a different choice of laws

26. *Hoechst Celanese*, 1994 WL 721651, at *4–5 (considering the insureds headquarters to be the place of contracting, negotiation, and performance); *E.I. du Pont*, 1991 WL 236943, at *3 (noting that "the place of contracting, negotiation and performance of the contracts all had the predominant, substantial contacts and 'most significant relationship'" with the insured's headquarters).

27. *Liggett Group*, 788 A.2d at 142 (holding that the location of the subject matter of an insurance contract did not provide "meaningful light on the choice of law" where there were lawsuits in 49 states and the District of Columbia).

28. New Warren has argued that Massachusetts has the most significant relationship to the Houdaille Policies because the Warren Pumps business has always been based in Massachusetts. But, the Houdaille Policies were issued to protect all of Houdaille and not just the Warren Pumps business. Accordingly, the policies are best viewed from a Houdaille-wide perspective. New Warren has not argued that Massachusetts has a stronger connection to the Houdaille Policies than other jurisdictions. Rather, New Warren has argued that Massachusetts law should apply because Massachusetts public policy favors the assignability of insurance rights. But, New York, which does have the most significant relationship to the Houdaille Policies, is in accord with Massachusetts on this issue and therefore it is not necessary for me to determine whether Massachusetts has a sufficiently strong public policy interest that would justify implementing Massachusetts state law despite the fact that Massachusetts does not have the most significant relationship to the contracts at issue in this litigation.

29. *See generally Liggett Group*, 788 A.2d 134 (applying North Carolina law to a company that conducted business throughout the United States and moved its headquarters twice during the relevant policy period); *Hoechst Celanese*, 1994 WL 721651, at *4–5 (applying one choice of laws analysis to a comprehensive group of insurance contracts).

30. RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188 cmt. b. (1971).

analysis for each policy, then there would be a risk of a court inconsistently applying identical policy language within a single integrated insurance scheme. For example, New Warren and New Viking would have this court apply New York law to the Policies that issued before the move, and Florida law to the Policies that issued afterwards. But, the language of the Policies issued in the era when Houdaille was headquartered in New York is largely identical to that of the Policies issued when Houdaille was in Florida. As a result, to the extent that New York and Florida law took different approaches to an issue important to the interpretation of the Houdaille Policies, this court would have to treat otherwise identical language differently.

That result would make little sense in the case of an integrated series of contracts like the Houdaille Policies. The obvious reason why Houdaille purchased a continuous and tightly-related group of policies was to create seamless coverage. The Policies were clearly intended to work together in order to adequately protect Houdaille, a result that would be frustrated by interpreting identical policies in a different way. For example, one of the more contentious issues that the parties are debating is how to allocate insurance coverage in the case of claims for injuries resulting from exposure spanning multiple policy periods—a complicated question upon which different jurisdictions have come to different conclusions. Applying the law of two jurisdictions to this question might result in a court grafting two sepa-rate schemes onto policies that use identical language, creating an inconsistent result with difficult-to-predict consequences. Likewise, contradictory results concerning, for example, the trigger or scope of coverage and the assignability of insurance rights would be possible.

■ Because of these issues, Delaware courts have applied the law of the jurisdiction that bears the most significant relationship to the insurance coverage as a whole.[31] Here, that means New York law. Houdaille was headquartered in New York when it began the insurance program at issue here. As a result, the reasonable expectations of the parties to the Houdaille Policies would have been that New York law would apply to all of the Policies.[32] Even when insurers issued policies after 1977 (*i.e.*, to a Houdaille that was headquartered in Florida), those insurers knew that Houdaille had originally been headquartered in New York and that they were agreeing to take part in a comprehensive insurance scheme that had been conceived in and already had a substantial relationship with New York. Further, there is no way that the Excess Insurers who issued policies to Houdaille in 1967 could have predicted that Houdaille was going to move its headquarters to Florida in a decade.

Put another way, whatever the language in the existing Policies meant as of Houdaille's move to Florida, after that move and when it was incorporated in later Policies, that language still had that same meaning. To apply Florida law to the later-issued

---

31. *See, e.g., Liggett Group,* 788 A.2d at 145 (applying North Carolina law to over one-hundred policies because North Carolina had the most significant relationship to the coverage as a whole); *Hoechst Celanese,* 1994 WL 721651, at *3 (citing *E.I. du Pont,* 1991 WL 236943); *Chesapeake Utilities Corp. v. American Home Assur. Co.,* 704 F.Supp. 551 (D.Del. 1989).

32. *See Hoechst Celanese,* 1994 WL 721651, at *4–5· (applying New York law to insurance contracts purchased by a company that was originally based in New York but later moved its headquarters to New Jersey).

Policies could create a bizarre result whereby later activities like a change of headquarters could change the parties' bargain with no evidence of any intent to do so.

Accordingly, I find that New York has the most significant relationship to the Excess Policies and therefore that its law governs those Policies. I note, however, that, although this opinion follows the laws of New York in order to interpret and apply the Houdaille Policies, the result of this analysis would be the same if Florida law applied because both states embrace the same principles of contract interpretation.

### C. General Principles Of Contract Interpretation

The Houdaille Policies are themselves all contracts governed by New York law's general principles of contract interpretation.[33] In addition, various contracts at issue are governed by Florida,[34] Delaware,[35] and New York[36] law. Fortunately, all three jurisdictions apply the same general principles of contract interpretation.

In Delaware, Florida, and New York, the meaning of an unambiguous contract is a question of law for the court to determine.[37] In determining meaning, a contract is to be read as a whole, with a court giving effect to every term therein.[38] Individual terms should not be read to frustrate the parties' clear purpose.[39] And, where a contract is unambiguous, a court will apply that clear meaning and not use parol evidence to create ambiguity in an otherwise unambiguous contract.[40] Extrinsic evidence can only be used to the extent the contract itself is susceptible to multiple reasonable interpretations.[41] Finally, if the agreement is ambiguous and extrinsic evidence does not clarify the vague terms, then the ambiguity is to be resolved against the insurer per the *contra proferentum* rule.[42]

---

33. *See Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (N.Y.1978) (applying general principles of contract interpretation to an insurance contract).

34. McKay Aff. Ex. 14 ("Viking AAA") at 5.

35. McKay Aff. Ex. 23 ("Viking Stock Agreement") § 5.05

36. McKay Aff. Ex. 8 ("Warren ASA Agreement") § 13.05.

37. *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992); *Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.*, 771 So.2d 628, 630–31 (Fla. Dist.Ct.App.2000); *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 848 N.Y.S.2d 603, 878 N.E.2d 1019, 1021 (2007).

38. *Cross Armored Carrier Corp. v. Valentine*, 49 Misc.2d 917, 268 N.Y.S.2d 792, 797 (N.Y.Sup.Ct.1966); *Weiner v. Selective Way Ins. Co.*, 793 A.2d 434, 440 (Del.Super.2002); *Auto–Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla.2000).

39. *In re IAC/InterActive Corp.*, 948 A.2d 471, 496 n. 101 (Del.Ch.2008); *Paddock v. Bay Concrete Indus., Inc.*, 154 So.2d 313, 316 (Fla. Dist.Ct.App.1963); *Kass v. Kass*, 91 N.Y.2d 554, 673 N.Y.S.2d 350, 696 N.E.2d 174, 181 (1998).

40. *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876 (N.Y.2004); *Lamberton v. Travelers Indem. Co.*, 325 A.2d 104, 106 (Del.Super.1974), *aff'd* 346 A.2d 167 (Del.1975); *Weldon v. All American Life Ins. Co.*, 605 So.2d 911, 914 (Fla.Dist.Ct.App. 1992).

41. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228 (Del.1997); *Taylor v. Taylor*, 1 So.3d 348, 350 (Fla.Dist.Ct.App.2009); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1998).

42. *See, e.g., State v. Home Indem. Co.*, 66 N.Y.2d 669, 671, 495 N.Y.S.2d 969, 486 N.E.2d 827 (1985) (if "tendered extrinsic evidence is itself conclusory and will not resolve

## IV. *New Warren's And New Viking's Entitlement To Exercise The Rights Of An Insured*

The question of whether New Warren and New Viking are even entitled to use the Excess Policies to address the Houdaille–Era Claims depends on a series of agreements that Houdaille entered into beginning in 1985.

By the end of December 1984, Houdaille had not only purchased the Warren Pumps and Viking Pump businesses, but Houdaille had merged with the companies that once owned those businesses. As a result, there was no distinct Warren Pumps or Viking Pump entity. Houdaille owned all of the Warren Pumps and Viking Pump assets and was liable for any claims that one would think of as being brought against "Warren Pumps" or "Viking Pump." An asbestos claim asserted in December 1984, for example, would have been brought against Houdaille itself. Houdaille would have then been able to turn to Liberty Mutual and the Excess Insurers in order to protect itself from liability. Nor is there any dispute on this motion that the Houdaille–Era Claims are the result of occurrences that happened while the Viking and Warren businesses were part of Houdaille. In other words, had Houdaille not broken up and changed its form, Houdaille would have been liable for the Houdaille–Era Claims and able to use the Excess Policies to cover those liabilities.

On January 31, 1985, however, Houdaille transferred Warren Pumps, Viking Pump, and several other businesses into newly created and wholly owned Houdaille subsidiaries.[43] And, Houdaille later engaged in a series of transactions that divested it of the Warren and Viking businesses.

At their most general level, the motions about New Warren's and New Viking's entitlements to exercise the Insurance Rights concern what happened to the liability for the Houdaille–Era Claims and to the Houdaille–Era Insurance Rights when Houdaille divested Warren Pumps and Viking Pump. New Warren and New Viking argue that in these transactions Houdaille transferred both responsibility for the Claims and the Insurance Rights. This does not mean that New Warren or New Viking argue that they have been given the actual Policies themselves. Instead, those companies believe that they received the Insurance Rights that were created under those Policies once there was a recoverable liability. For example, New Warren does not argue that it was given coverage for occurrences that happened after the acquisition. Instead, New Warren believes that as part of its acquiring an as-yet-unasserted liability from say 1982, it also received the right to make the claim that Houdaille could have made on the Excess Insurers or Liberty Mutual for that liability.

The Excess Insurers argue, however, that New Warren and New Viking do not have both the relevant liabilities and the

the equivocality of the language of the contract ... the ambiguity must be resolved against the insurer which drafted the contract"); *Prudential Property and Cas. Ins. Co. v. Swindal*, 622 So.2d 467, 472 (Fla.1993) ("Courts are to give effect to the intent of the parties as expressed in the policy language, and if the policy is ambiguous, the ambiguity must be resolved liberally in favor of the insured and strictly against the insurer who prepared the policy.") (citations omitted).; *Pi-*

*oneer Nat'l Title Ins. Co. v. Child, Inc.*, 401 A.2d 68 (Del.1979) (noting that an ambiguous insurance policy "must be liberally construed in favor of the insured and strictly construed against the insurer") (quoting *Sandler v. N.J. Realty Title Ins. Co.*, 36 N.J. 471, 178 A.2d 1, 5 (1962)).

43. McKay Aff. Exs. 8, 22.

corresponding Insurance Rights so they cannot make claims on the Excess Policies.

Before I get to the specifics of the Excess Insurers' arguments on these points, which, in keeping with the Excess Insurers' splatter-gun approach to this litigation, are many and variable, it is useful to pause here to explain the business rationale behind what New Warren and New Viking claim happened. This is because as part of their general argument, the Excess Insurers contend that it would have been economically irrational for Houdaille to have assigned the Insurance Rights. Specifically, the Excess Insurers note that as a necessary part of any assignment Houdaille had to divest itself of whatever it was assigning.[44] And, under basic principles of tort law, Houdaille could not eliminate its liability to a tort plaintiff by having a third party accept that liability.[45] Regardless of its arrangements with New Warren and New Viking, Houdaille could still be sued for the Houdaille–Era Claims. Accordingly, the Excess Insurers conclude that it would be irrational for Houdaille to have assigned away the Insurance Rights and thus this court should not read any contract as effecting that result.

But, Houdaille did not just assign away these Insurance Rights for free. As part of the bargains, New Warren and New Viking promised to indemnify Houdaille for its liabilities. In other words, New Warren and New Viking promised to protect Houdaille from the Houdaille–Era Claims for which they assumed responsibility. And, those promises did not have deductibles or policy limits; Houdaille did not have to pay per occurrence deductibles or worry about its insurance coverage running out due to the volume of claims against it. Because Houdaille extracted a broad promise of indemnity from New Warren and New Viking, transferring the Houdaille–Era Insurance Rights also made sense. It ensured that New Warren and New Viking had assets to help satisfy the Houdaille–Era Claims and their obligations to indemnify Houdaille. By coupling the transfer of liabilities with the accompanying Insurance Rights, Houdaille put New Warren and New Viking in the best position to meet their obligations and avoid a spill-over that would interfere with Houdaille's future operations. In short, although one can quibble about which type of protection is preferable, the bargain that New Warren and New Viking claim to have struck was not irrational from Houdaille's perspective.

Having addressed that global argument, I now turn to the Excess Insurers' specific arguments. These involve two basic theories: (1) first, that Houdaille did not actually agree to assign the Insurance Rights covering the Houdaille–Era Claims to New Warren and New Viking; and (2) second, even if Houdaille so agreed, it could not transfer the Insurance Rights because of the anti-assignment provisions within the Houdaille Policies. I begin with the argument that New Warren was not assigned

---

44. 6 Am.Jur.2d *Assignments* § 122 ("[O]nce a valid and unqualified assignment is made, all interests and rights of the assignor are transferred to the assignee; the assignor losses all control over the thing assigned, and cannot do anything to defeat the assignee's rights.") (citations omitted); *see also TPZ Corp. v. Dabbs*, 25 A.D.3d 787, 808 N.Y.S.2d 746, 751 (N.Y.App.Div.2006) ("Under New York law, an assignment occurs only where the assignor retains no control over the funds, no authority to collect and no power to revoke.").

45. Lou R. Kling and Eileen T. Nugent, Negotiated Acquisitions of Companies, Subsidiaries and Divisions § 15.01 n. 10 (17th ed. 2001) ("[T]ransferring a liability does not relieve the transferor of liability unless the party to whom the transferor is liable has agreed to a release. The transfer merely renders the transferee responsible as well.").

the Insurance Rights for its share of the Houdaille–Era Claims.

## A. *Warren Pumps*

### 1. *Relevant History*

In January 1985, Warren Pumps was transferred to Warren Pumps–Houdaille, Inc. ("WPH") which was a wholly owned Houdaille subsidiary. Then, only a few months later, a group of Warren Pumps managers proposed a management-led buyout of the Warren Pumps business. In June 1985, Houdaille and WPH entered into the Warren ASA whereby Houdaille and WPH agreed to sell the Warren Pumps business to New Warren, which the Warren Pumps managers had created for that purpose.

In that ASA, New Warren agreed to be liable for all of the as-yet-unasserted Houdaille–Era Claims arising out of Warren Pumps business:

[A]s of the commencement of business on the day of the Closing and thereafter, [New Warren] agrees that [New Warren] shall be responsible and liable for all workers' compensation claims, general liability ... claims and automotive liability claims on a claims made basis for which [WPH] directly or through any Predecessor is responsible [other than certain claims that are asserted prior to the Warren ASA's closing].[46]

As initially contemplated, Houdaille and WPH did not, however, give New Warren any Insurance Rights in order to satisfy these claims. Instead, New Warren was obligated to obtain $25 million in "claims-made" insurance.[47] New Warren's procurement of that coverage was a closing condition of the Warren ASA.

But, New Warren had trouble obtaining that coverage. And so, in August 1985, New Warren, WPH, and Houdaille amended the Warren ASA in order to give New Warren the Houdaille–Era Insurance Rights. In the resulting Warren ASA Amendment, Houdaille, WPH, and New Warren changed New Warren's obligations so that it only had to obtain $1 million in general insurance and then provided that:

[WPH] and Houdaille acknowledge that ... [WPH] and Houdaille have permitted [New Warren] to utilize the insurance coverage in excess of the primary casualty limits identified above, which [WPH] and Houdaille have in effect, for claims made pertaining to occurrences prior to the date of the Closing, but only to the extent that such insurance coverage is in fact available.[48]

Having amended the Warren ASA in this manner, the parties closed on that Agreement, and New Warren took over the Warren Pumps business.

### 2. *The Warren ASA Assigned Coverage Under The Excess Policies*

The question before this court is which insurance rights were assigned to New Warren in the Warren ASA Amendment.[49]

---

46. O'Brien Aff. Ex. D. (hereinafter "Warren ASA") § 2.10.

47. Warren ASA § 2.10. Unlike the occurrence-based insurance in the Houdaille Policies, claims-made insurance protects the insured against claims made during the policy period as opposed to liabilities arising out of the policy period. As a result, in the case of asbestos exposure in the 1970s but not sued on until 2008, a claims-made insurance policy covering 2008 would be triggered.

48. O'Brien Aff. Ex. E (hereinafter "Warren ASA Amendment") at WAR0005778–79.

49. In their Sur–Reply, the Excess Insurers argue for the first time that there was no assignment because, based upon the language in the Warren ASA Agreement, Houdaille did not intend to totally divest itself of the right to use the Policies for liabilities arising from Houdaille–Era Claims, so there was no valid assignment. Having failed to raise that argument in a manner that would have allowed

The Excess Insurers now argue that the Warren ASA Amendment only assigned to New Warren the right to make claims on the two layers of Liberty Policies; that is, the primary and umbrella layers of the overall Houdaille coverage program. New Warren, however, argues that it was assigned all of the Houdaille–Era Insurance Rights, including the Excess Policies.

Notably, this court has already addressed this general issue at length. During Phase I, New Warren, New Viking, and Liberty Mutual litigated the meaning of the Warren ASA Amendment at length. Specifically, the parties disagreed about what the phrase "insurance coverage in excess" meant for which policies Houdaille was entitled to access. New Viking and Liberty Mutual argued that New Warren was only granted rights to the Umbrella and Excess Policies. New Warren, by contrast, argued that it had been assigned rights to all of the Houdaille Policies. Although the ASA Amendment was ambiguous on this issue, the parties' course of dealing under the Amendment revealed that WPH, Houdaille, New Warren, and Liberty Mutual had agreed to let New Warren exercise all the rights of an insured and, accordingly, this court conclud-

ed · that the parties intended that the Amendment granted New Warren the right to use the Primary Policies along with the Umbrella Policies to address the Houdaille–Era Claims.[50]

In revisiting this issue, the Excess Insurers argue for yet a third interpretation: that Houdaille, WPH, New Warren, and Liberty Mutual only planned to allow New Warren to use the two layers of Liberty Mutual coverage. Notably, neither New Viking, which had an interest in limiting the extent of New Warren's rights, nor Liberty Mutual argued that there was no attempt to assign New Warren the right to use the Excess Policies.[51] And, with good reason: whatever the ASA Amendment's other ambiguities, there is no reasonable reading of that document which would indicate that New Warren was not assigned the right to use the Excess Policies to address Houdaille–Era Claims.[52]

▮ Rather, the ASA Amendment assigns "*the* insurance coverage in *excess* of the primary casualty limits."[53] The Excess Policies were unquestionably coverage "in excess of the primary casualty limits." Nothing in the ASA Amendment distinguishes between the two layers that Liber-

New Warren to respond during briefing, the Excess Insurers waived that argument. *In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del.Ch.2001). But, even if the Excess Insurers had not waived that argument, the same course of conduct that this court addressed in its previous opinion shows that Houdaille had intended to assign to New Warren the right to make claims under the Excess Policies based on pre-transfer occurrences. *Cf. Viking Pump I*, 2007 WL 2752914, at *25. As with many of their other arguments, the Excess Insurers liberally advance their own view of what *others* intended without any tangible evidence and when the *others* themselves behaved in a manager contrary to the Excess Insurers' argument about the *others* ' intent.

**50.** *Viking Pump I*, 2007 WL 2752914, at *29.

**51.** *See id.*, at *14.

**52.** As part of their briefing, the Excess Insurers also make speculative musings whether or not Houdaille gave WPH these rights when Houdaille created New Warren. But, the Excess Insurers never indicated why that question is important, and I do not dilate on it. Both Houdaille and WPH were parties to the Warren ASA as well as the subsequent Warren ASA Amendment. Accordingly, as long as those agreements purported to assign New Warren the Insurance Rights, it is irrelevant which part of Houdaille held those rights before the transfer because New Warren would have been assigned the Rights regardless.

**53.** Warren ASA Amendment at WAR0005778–79 (emphasis added).

ty Mutual issued and the layers of coverage provided by the Excess Insurers. Nor have the Excess Insurers introduced any parol evidence indicating that Houdaille or New Warren understood this assignment to only apply to the Primary and Umbrella Policies. And, there is no reason why Houdaille would have assigned rights to use those two layers of coverage but not the right to make claims on the Excess Policies, which could only be used once the first two layers of coverage had been exhausted. The Excess Insurers' argument, to be direct, lacks any linguistic or business force.

Accordingly, I find that the Warren ASA Amendment unambiguously assigned the Insurance Rights under the Excess Policies for New Warren's portion of the Houdaille Claims.

### B. *Viking Pump*

In contrast to the question of New Warren's status as an insured, this court has not yet addressed whether New Viking has Insurance Rights. This is because none of the parties to the earlier summary judgment motions argued that New Viking did not have Insurance Rights.

### 1. *Relevant History*

In the case of Viking Pump, the January 1985 assignment placed the Viking Pump business directly into the entity I have dubbed New Viking. New Viking was then operated as a wholly owned subsidiary of Houdaille until January 1988, when Houdaille sold all of its stock in New Viking, along with Houdaille's stock in other subsidiaries, to IDEX.

For Viking Pump, the first part of this process was effected through the Viking AAA in which New Viking was assigned assets relating to Viking Pump and, in turn, accepted the liabilities for the same. The assets included "all of the right, title and interest of [Houdaille] in and to all of the properties and assets of [Houdaille] (whether tangible or *intangible*, real or personal) *required for the conduct of the business of* [Viking Pump]." [54] Accompanying this assignment was a transfer of the liabilities attributable to the Viking Pump business. Among those liabilities were "all of the obligations and liabilities, directly or indirectly, of [Viking Pump] or the business or in part thereof or any Predecessor . . . or the business in whole or in part thereof, of whatsoever nature." [55] In this category, the Viking AAA specifically included *"[a]ll liabilities and obligations, whether known or unknown of the type covered by . . . general liability . . . insurance . . . of [Viking Pump]."* [56] New Viking also agreed to indemnify Houdaille for these liabilities.

Houdaille then continued to operate Viking Pump and the other divisions that it had transferred as wholly owned subsidiaries until January 1988, when New Viking and several of the other subsidiaries were sold to IDEX through the Viking Stock Agreement. Specifically, IDEX purchased all of the outstanding shares of New Viking along with the stock of Band–It–Houdaille, Inc., Hydraulics–Houdaille, Inc., Lubriquip–Houdaille, Inc., Strippit–Houdaille, Inc., and Warren–Rupp–Houdaille, Inc. (collectively with New Viking, the "Sold Subsidiaries").[57] In exchange for those subsidiaries, Houdaille received $190 million and 20,000 shares of stock in IDEX.[58]

---

54. Viking AAA at 1 (emphasis added).

55. *Id.* at 2–3.

56. *Id.* at 4 (emphasis added).

57. Viking Stock Agreement § 1.01.

58. *Id.* § 1.02.

In certain discrete instances, the Stock Agreement explicitly transferred assets to where the parties wanted them. For example, the Stock Agreement requires Houdaille to transfer sponsorship of the Houdaille Industries, Inc. Savings Plan to IDEX.[59] And, Houdaille agreed to give IDEX notes that the Sold Subsidiaries had issued.[60] The Stock Agreement also allows Houdaille to retain cash that it had received on behalf of those Subsidiaries.[61]

Nowhere in the Viking Stock Agreement is there any mention of New Viking's or any other subsidiary's right to insurance coverage. Section 5.12 of the Stock Agreement does, however, provide that:

> Upon the Closing, [IDEX] will as a result of such transaction assume only those liabilities that pertain to the [Sold Subsidiaries], including, but not limited to, those liabilities set out on Schedule B hereto, and [IDEX] shall *release, indemnify and hold Houdaille harmless from all such liabilities; provided, however, that Houdaille shall remain liable to the extent of insurance coverage available (in the event of claims arising from occurrences prior to the Closing Date, only to the extent such coverage is available on an occurrence basis) under existing or previously existing casualty insurance policies (including workmen's compensation) and only if [IDEX] reimburses Houdaille for the deductible, if any, applicable to any such claim for which coverage is claimed.* It is understood that, except as indicated on Schedule B, [IDEX] does not assume any liabilities that pertain to Houdaille or John Crane and that Houdaille shall release, indemnify and hold

Buyer harmless from all other liabilities pertaining to Houdaille or John Crane.[62]

Under the terms of the Viking Stock Agreement, Houdaille's stock in Viking and the rest of the Sold Subsidiaries was then transferred. New Viking has remained an IDEX subsidiary since.

### 2. *New Viking's Entitlement To Exercise The Rights Of An Insured*

New Viking and the Excess Insurers disagree about what both the Viking AAA and the Viking Stock Agreement meant to do with regard to coverage for the Houdaille–Era Claims. Specifically, New Viking claims that, as a result of these two transactions it was assigned the liability for the Houdaille–Era Claims along with the accompanying Insurance Rights. The Excess Insurers respond that New Viking did not receive the Insurance Rights.

#### a. *The Viking AAA*

The disagreement over the Viking AAA is whether that agreement transferred the Insurance Rights to New Viking by assigning "all of the properties and assets of [Houdaille] (whether tangible or intangible, real or personal) required for the conduct of the business of the Viking Pump Division, Houdaille Industries."[63] The Excess Insurers argue that "required" should be read narrowly: because New Viking could have manufactured pumps without the Insurance Rights, those Rights were not assigned. That reading, however, is unreasonable in light of the broad language within the Viking AAA and the fact that the Viking AAA specifically contemplated New Viking responding to the

59. *Id.* § 5.14.

60. *Id.* § 1.01.

61. *Id.* § 5.11.

62. *Id.* § 5.12 (emphasis added).

63. Viking AAA at 1.

Houdaille–Era Claims as part of its business.

 For starters, it is important to note that the Viking AAA's asset grant uses broad language. For example, it specifically includes "intangible" as well as tangible assets. In addition, the enumerated assets are listed "without limitation."[64]

 And, more importantly, the Excess Insurers' argument does not comport with the rest of the Viking AAA.[65] Specifically, the Excess insurers argue that insurance rights were "required for the conduct of the business of the Viking Pump Division, Houdaille Industries" because:

> The "business" of the Viking division was part of the business of Houdaille—the manufacture of pumps. Historical insurance policies issued to Houdaille were in no way "required" for the newly formed [New Viking] subsidiary to conduct its manufacturing business going forward.[66]

But, the Viking AAA specifically contemplated that the "business" of New Viking would involve more than just manufacturing and selling pumps. A business is defined not only by its product line, but also by the contractual commitments it must meet in order to function. And, Houdaille and New Viking explicitly provided that New Viking would "assume[ ] and agree[ ] to pay or otherwise perform when due all of the obligations and liabilities, directly or indirectly, of the Viking Pump Division, Houdaille Industries, Inc."[67] The Excess Insurers admit that this transferred all of the liabilities from the Viking Pump division into New Viking.[68] And, the only way in which New Viking could have efficiently performed this part of its business operations without selling off its own assets and decreasing the value of Houdaille's holdings would have been to use Houdaille's pre-existing coverage. As the Excess Insurers themselves argue with respect to the Viking Stock Agreement, reading an agreement as transferring only the Houdaille–Era Claims but not the Houdaille–Era Insurance Rights would be "absurd."[69] In short, the Houdaille–Era Insurance Rights were necessary for Viking to perform part of its business—responding to the Houdaille–Era Claims.

64. The Excess Insurers have also argued that there was no valid assignment because insurance rights were not specifically enumerated as a transferred asset. But, that level of specificity was not necessary. The Viking AAA is governed by Florida law. Viking AAA at 4. Under Florida law, "[n]o particular words or form of instrument is necessary to effect an equitable assignment and any language, however informal, which shows an intention on one side to assign a right ... and an intention on the other to receive, if there is a valuable consideration, will operate as an effective equitable assignment." Giles v. Sun Bank, N.A., 450 So.2d 258, 260 (Fla.Dist.Ct.App.1984); see also Sourcetrack LLC v. Ariba, Inc., 958 So.2d 523, 526 (Fla.Dist.Ct.App.2007). As long as New Viking and Houdaille used language evidencing Houdaille's intention to assign insurance rights to New Viking, there was a valid assignment under Florida law. Indeed, the Viking AAA also did not specifically identify the plants, equipment, and real property that New Viking was to acquire. Were they not transferred under the Agreement? The Viking AAA was a broad transfer of all the assets, including the Insurance Rights, required for the Viking Pump business.

65. Discover Prop. & Cas. Ins. Co. v. Beach Cars of West Palm, Inc., 929 So.2d 729, 732 (Fla.Dist.Ct.App.2006) (noting that contracts are to be read as a whole).

66. Excess Insurers' Opp. To Viking Motion at 14.

67. Viking AAA at 2.

68. Excess Insurers' Opp. To Viking Motion at 14.

69. Excess Insurers' Opp. To Viking Sur–Reply at 15.

And, from Houdaille's perspective, New Viking's promise to assume and hold Houdaille harmless from liability for Houdaille–Era Claims would have had far less meaning without the insurance coverage to recover for those suits. Under basic tort principles, New Viking's assumption of liability for the Houdaille–Era Claims did not allow Houdaille to cleanse itself of those liabilities, meaning tort plaintiffs could seek relief from Houdaille if New Viking proved undercapitalized. Therefore, New Viking's assumption and promise to indemnify Houdaille only protected Houdaille from liability to the extent that New Viking could cover those liabilities itself so that tort plaintiffs would not proceed against Houdaille.

This also leads to a bigger point, which is that it would make little sense to read the Viking AAA as having assigned liabilities to New Viking but not the insurance coverage for those liabilities because doing so would have been tantamount to Houdaille waiving valuable insurance rights.[70] The Houdaille Policies only protect an insured from *its* liability. If Viking did not have the right to use the Houdaille Policies, then not only would New Viking have to pay for any liabilities itself while it was a Houdaille subsidiary, but Houdaille would also suffer an accompanying loss in the form of a less valuable subsidiary. And, that loss would not have been recoverable under the Excess Policies because a separate legal person—New Viking—and not Houdaille had been held liable for the loss in question.[71]

This is not a small concern for an important reason. By assigning the Houdaille–Era Insurance Rights to New Viking, Houdaille was matching its liabilities with the entity tort plaintiffs were most likely to sue—*so long as New Viking had the assets required to respond to those plaintiffs.* One reason to place business lines in subsidiaries is to cabin liabilities, including for claims arising from pre-spin-off occurrences. It defeats that purpose if the target that one wishes plaintiffs to aim at—the spun-off subsidiary—does not get the insurance rights to address the pre-spin-off claims. Then, plaintiffs have an incentive to sue the parent. So long as the subsidiary must indemnify the parent for the pre-spin-off claims, transferring the spun-off subsidiary the insurance rights aids, not injures, the parent by shifting the cost of deductibles to the subsidiary, encouraging tort plaintiffs to sue only the subsidiary, and ensuring that there is no gap in coverage.

For these reasons, I conclude that the only reasonable interpretation of the Viking AAA is that it assigned the right to recover under the Houdaille Policies for liabilities relating to the Viking Pump busi-

---

**70.** Cf. *Huntington on the Green Condo. v. Lemon Tree I–Condo.*, 874 So.2d 1, 5 (Fla.Dist.Ct. App.2004) ("[I]f one interpretation would lead to an absurd conclusion, then such interpretation should be abandoned and the one adopted which would accord with reason and probability.") (citation omitted).

**71.** See 3 COUCH ON INS § 40:15 ("[A] parent company can not recover for the losses of its subsidiaries."); *Unijax, Inc. v. Factory Ins. Assn.*, 328 So.2d 448, 452 (Fla.Dist.Ct.App. 1976) (holding that a corporation could not maintain an action against the corporation's insurer to recover for losses to the corpora-

tion's subsidiary). The Excess Insurers have asserted without support that Houdaille could in fact recover if a subsidiary like New Viking was held liable for a loss that Houdaille had insurance against, but the Excess Insurers cite to no authority for that proposition and it is contrary to the law on this subject. Given the aggressive way in which the Excess Insurers have prosecuted this action, it also seems unlikely that they would have conceded, rather than litigated, that point if such a claim was actually made by Houdaille in that scenario.

ness and predating the Viking AAA to New Viking.

### b. *The Viking Stock Agreement*

### i. *The Stock Agreement Does Not Undo The Prior Assignment And, If It Did, Transfers The Insurance Rights To New Viking*

Had the parties simply sold off New Viking in the Stock Agreement, then the question of whether New Viking possesses the Houdaille–Era Insurance Rights would be a simple one. The familiar default rule in stock sales is that a change in the ownership of a company does not affect the rights and liabilities of the company.[72] Absent a contrary agreement, New Viking would have retained liability for the Houdaille–Era Claims and kept the accompanying Insurance Rights.

This matter, however, is complicated by § 5.12 of the Stock Agreement which provides that:

Upon the Closing, [IDEX] will as a result of such transaction assume only those liabilities that pertain to the [Sold Subsidiaries], including, but not limited to, those liabilities set out on Schedule B hereto, and [IDEX] shall release, indemnify and hold Houdaille harmless from all such liabilities; provided, however, that *Houdaille shall remain liable to the extent of insurance coverage available (in the event of claims arising from occurrences prior to the Closing Date, only to the extent such coverage is available on an occurrence basis) under ex-* *isting or previously existing casualty insurance policies (including workmen's compensation) and only if [IDEX] reimburses Houdaille for the deductible, if any, applicable to any such claim for which coverage is claimed.*[73]

By its terms, this provides that Houdaille will keep liabilities for which it has insurance, as long as IDEX pays the deductibles on those liabilities. The problem is that, as has already been discussed, by the time of the Viking Stock Agreement, Houdaille had transferred the Houdaille–Era Claims to New Viking along with the Houdaille–Era Insurance Rights. Neither New Viking nor the Excess Insurers has provided a compelling explanation of § 5.12 that accounts for the fact that New Viking already had the Houdaille–Era Insurance Rights. And, given that the other Sold Subsidiaries were apparently in an identical situation to New Viking, the fact that § 5.12 also transfers the "liabilities that pertain" to those subsidiaries does not clarify this question.

The Excess Insurers speculate that IDEX and Houdaille used § 5.12 to transfer the Houdaille–Era Claims and Insurance Rights from New Viking back to Houdaille.[74] But, that interpretation overlooks several parts of § 5.12. First, nothing in § 5.12 purports to transfer any asset. This point is particularly important in light of the fact that, as the Excess Insurers stress, an assignment of assets requires that a party at least manifest an intention to assign.[75] And, New Viking

---

**72.** *See, e.g., In re KB Toys Inc.,* 340 B.R. 726, 728 (D.Del.2006). The Viking Stock Agreement is governed by Delaware law. *See* Viking Stock Agreement § 5.05.

**73.** *Id.* § 5.12 (emphasis added).

**74.** Excess Insurers' Sur–Reply Br. at 15 (arguing that "[t]he Stock Agreement clearly al-

located the liabilities and assets of [New Viking] between Houdaille and IDEX, leaving no basis for Viking's argument that VPH continued to hold Houdaille's pre–1985 liabilities arising from the Viking division after the Stock Agreement").

**75.** Excess Insurers' Opposition Br. at 11–12 ("The assignment of property in an assign-

was not even a party to this Agreement. The Excess Insurers have not made anything but perfunctory efforts to explain how New Viking assets could have been transferred without New Viking's consent.[76] Finally, even with respect to liabilities, § 5.12 only states that "Houdaille shall *remain* liable," suggesting that Houdaille and IDEX saw this provision as only maintaining the status quo, not transferring any liabilities back to Houdaille.

For its part, New Viking has not offered any explanation for § 5.12. Rather, its briefing on this issue centers entirely on why the Excess Insurers' interpretation is unreasonable.

In any event, I do not believe that § 5.12 of the Stock Agreement has any material effect on the proper outcome. Even if § 5.12 somehow clearly undid the prior transfer of the liability for the Houdaille–Era Claims in the Viking AAA, *which it did not*, the later Stock Agreement can only be read as itself a contractual promise by Houdaille to transfer the Insurance Rights for the Houdaille–Era Claims so long as IDEX meets a contractual set of conditions. Why do I say this? Section 5.12 provides that, if Houdaille has insur-

ance, then Houdaille will be liable for Houdaille–Era Claims to, and only to, the extent of that insurance coverage so long as IDEX pays the deductibles on the policies. Any liability on top of the policy limits is the responsibility, not of Houdaille, but of IDEX. Thus, this assignment provides a conditional mechanism whereby IDEX can use the Insurance Rights up to the policy limits, if it is named as a defendant in a Houdaille–Era Claim, and if it pays the appropriate deductible. In other words, § 5.12 is functionally identical to transferring the liabilities for the Houdaille–Era Claims to IDEX and assigning IDEX the Insurance Rights to cover those Claims. That is, under § 5.12 the outcome is an effective transfer of the Insurance Rights: when a Houdaille–Era Claim arises against it, IDEX can use the Excess Policies to cover the liabilities so long as it pays the deductible.

The parties likely structured the transfer of the Insurance Rights in this manner to ensure that there was no inadvertent gap in insurance coverage. By 1988, Houdaille had spent large sums in acquiring its insurance coverage, and the protection afforded by that coverage had value to IDEX. But, as this action illustrates, insur-

ment agreement must be identified with particularity, and the assignment must clearly demonstrate an intention to assign property. 'Although no particular formula is needed to create an assignment, there is need for some act or words that manifest an intent to assign.' ") (quoting *Property Asset Mgmt., Inc. v. Chicago Title Ins. Co., Inc.*, 173 F.3d 84, 87 (2d Cir.1999)). That there was no assignment of the Houdaille–Era Insurance Rights in § 5.12 but there was in the Viking AAA flows from the difference between those two Agreements. Although the Excess Insurers argue for a lot of formalities with respect to assignments, all that is needed is that the parties show an intent to assign. "No words of art are required to constitute an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient." 29 WILLISTON ON CONTRACTS § 74:3 (4th

ed.). The Viking AAA clearly evidenced an intent to assign; the only question the Excess Insurers raised was whether that intent included the Houdaille–Era Insurance Rights. And, although those assets were not specifically enumerated, when the Viking AAA is read as a whole, there is a clear intent to assign the Insurance Rights. By contrast, nothing in § 5.12 evidences any intent to assign any assets. Rather, that provision is aimed at apportioning liabilities.

**76.** Instead, the Excess Insurers quote 8 *Del. C.* § 271 which allows a corporation to "sell, lease or exchange all or substantially all of its property and assets" and, for purposes of that section, provides that "the property and assets of the corporation include the property and assets of any subsidiary of the corporation." 8 *Del. C.* § 271(a), (c).

ers can be zealous in their efforts to avoid paying out to their insureds. Accordingly, § 5.12 makes sense as a catchall: the parties to the Viking Stock Agreement would be guaranteed the benefits of an assignment without having to worry that later objections by Houdaille's insurers might thwart that bargain. In other words, the purpose of § 5.12 is to make sure that Houdaille and IDEX were not accidentally forfeiting insurance coverage. In actual practice, this reading of § 5.12 as a transfer of the Insurance Rights on specific conditions is exactly, as I next discuss, how the parties have addressed Houdaille–Era Claims brought against Viking Pump. Liberty Mutual has permitted IDEX and Houdaille's Successor, John Crane, to use the coverage so long as IDEX paid the applicable deductibles.

ii. *The Extrinsic Evidence Demonstrates That A Transfer Of The Insurance Rights Was Intended*

 Even if the language of § 5.12 were less clear, the extrinsic evidence relating to this issue corroborates my reading of the text of the Stock Agreement. In situations where the meaning of a contract is uncertain, Delaware law requires that I look beyond the contract itself in order to ascertain the parties' true intentions.[77] In such cases, "any course of performance accepted or acquiesced in without objection is given great weight in the interpre-

tation of the agreement." [78] Here, the uncontested course of conduct by the parties to the Viking Stock Agreement strongly favors New Vikings argument that it retained the liability for the Houdaille–Era Claims and the Insurance Rights.

First, as previously indicated, for a generation New Viking has acted as if it was responsible for the Houdaille–Era Claims. The Excess Insurers have not explained why New Viking would voluntarily do that or why IDEX, as New Viking's parent, would have allowed its subsidiary to respond to liabilities for which it was not responsible.[79]

And, not only has New Viking always acted as if it possessed the Houdaille–Era Insurance Rights, but John Crane, which was assigned rights under the Houdaille Policies and thus suffered a decrease in coverage every time New Viking made a claim on the Houdaille Policies, never sought to bar New Viking from using that coverage. Quite the contrary, John Crane has affirmatively stated to this court that it believes that New Viking was assigned the Houdaille Insurance Rights:

> John Crane has said from day one, with respect to Warren, John Crane believes Warren is entitled to coverage so long as it pays the retrospective premiums and deductibles which Warren has agreed to do. The same is true with respect to

77. *DeVilbiss,* 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity. But when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms.") (citation and footnote omitted).

78. *Sun–Times Media Group, Inc. v. Black,* 954 A.2d 380, 398 (Del.Ch.2008) (quoting Restate-

ment (Second) of Contracts § 202); *see also* Restatement (Second) of Contracts § 202 cmt. g ("The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning.").

79. *Cf.* Excess Insurers' Sur–Reply at 15 n. 12 (stating that "Viking voluntarily undertook the defense of certain asbestos-related claims").

Viking.[80]

Simply put, everyone who was a party to the Viking Stock Agreement has acted as if New Viking retained both liability for the Houdaille–Era Claims and the Insurance Rights. And, importantly, those parties even did so when these issues were against their own interests.

Nevertheless, the Excess Insurers argue that, contrary to how the parties have acted, they had actually agreed for New Viking to assign both the Claims and the Insurance Rights back to Houdaille. In order to support this conclusion, the Excess Insurers have provided their own extrinsic evidence, in the form of correspondence concerning the Stock Agreement, that generally replicates the problem of § 5.12: the correspondence states that after the Stock Agreement Houdaille will be liable for the Houdaille–Era Claims, but it never mentions the fact that liability for those Claims and the Insurance Rights to respond to them had been earlier vested in New Viking. For this reason, it is unsurprising that none of the correspondence mentions any transfer of assets or liabilities from New Viking back to Houdaille. For example, the Excess Insurers have produced an October 1987 Houdaille memorandum that states that "[e]xisting claims and claims for occurrences prior to the date of closing (but yet to be reported) will be the responsibility of Houdaille and would be covered under the previously purchased Houdaille insurance policies."[81] Similarly, an October 1988 letter from IDEX to Liberty Mutual stated that "[t]he responsibility for all claims associated with occurrences prior to January 22, 1988 was retained by Houdaille Industries."[82] Like § 5.12, this extrinsic evidence points to the parties contemplating some sort of assignment, whereby Houdaille would use the insurance coverage to cover IDEX and its subsidiaries in all but name, but provides no guidance as to what was intended with respect to the assets and liabilities that were already in New Viking.

Taken together, all of this evidence strongly suggests that Houdaille and IDEX did not somehow agree in 1988 to a transfer of New Viking assets and liabilities that undid the transfer accomplished through the prior agreement. As important, even if § 5.12 of the Stock Agreement governs, the parties to that contract have clearly treated that contract as a transfer of the Insurance Rights for the Houdaille–Era Claims to Viking Pump so long as it pays the deductibles. Therefore, for all these reasons, New Viking now is responsible for the Houdaille–Era Claims and has the Houdaille–Era Insurance Rights.

\* \* \*

As a final matter, I note my difficulty in understanding the Excess Insurers' motivation for making the argument that New Viking is not entitled to coverage. Even if their theory were correct (which it is not), the Excess Insurers would still be responsible for the Houdaille–Era Claims because Houdaille, if not New Viking, would hold the Insurance Rights and, therefore, be entitled to coverage under the Excess Policies and could now simply transfer the Insurance Rights it already believed were previously transferred to New Viking. From this perspective, it is frankly difficult to understand why the Excess Insurers are litigating this issue.

**80.** *Viking Pump v. Century Indemnity Co. et al.,* C.A. No. 1465–VCS at 53 (Del. Ch. Nov. 10, 2008) (TRANSCRIPT).

**81.** McKay Aff. Ex. 24.

**82.** McKay Aff. Ex. 29.

### C. The Anti–Assignment Provisions

■ Alternatively, the Excess Insurers argue that the assignments to New Warren and New Viking are void because the Excess Insurers did not consent to the assignments. The basis for this argument is the presence of anti-assignment provisions in the Houdaille Policies like the ones in the Umbrella Policies, which provide that "[a]ssignment of interest under this policy shall not bind [the insurer] until its consent is endorsed hereon."[83] All of the Excess Policies either follow form to that language or contain their own, similarly phrased exclusion. Houdaille never sought or received the Excess Insurers' consent to transfer rights under the Excess Policies and so the Excess Insurers argue that any assignment was invalid. But, to the extent that the Excess Insurers seek to use anti-assignment clauses to bar the transfer of claims based upon liabilities that Houdaille already had, those clauses are not enforceable under New York law.

■ Specifically, New York law generally does not permit anti-assignment clauses to be erected as a barrier to the transfer of "post-loss claims," that is to say claims for losses that have already happened.[84] This is based upon a judgment that, although insurers have a legitimate interest in protecting themselves against additional liabilities the insurer did not contract to cover, once the insured-against loss has occurred, there is no issue of an insurer having to insure against additional risk. Rather, in that circumstance, the only question is who the insurer will pay for the loss:

> Risk characteristics of the insured determine whether the insurer will provide coverage, and at what rate. An assignment could alter drastically the insurer's exposure depending on the nature of the new [policyholder]. "No assignment" clauses protect against any such unforeseen risk. When the loss occurs before the transfer, however, the characteristics of the [assignee] are of little importance: regardless of any transfer the insurer still covers only the risk it evaluated when it wrote the policy.[85]

---

83. *See* Winsbro Aff. Ex. 11. Several Excess Policies also have additional consent-to-assignment provisions containing substantially identical terms. Winsbro Aff. Ex. N.

84. *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir.2006) ("The enforceability of a no-transfer clause in an insurance contract is limited under New York law. As a general matter, New York follows the majority rule that such a provision is valid with respect to transfers that were made prior to, but not after, the insured-against loss has occurred."); *Mellen v. Hamilton Fire Ins. Co.*, 17 N.Y. 609, 615 (N.Y.1858) (holding that an anti-assignment clause did not apply to a post-loss assignment). The rule is the same in most other jurisdictions. 3 COUCH ON INS. § 35:7 (noting that the "the great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments thereof except with the consent of the insurer apply only to assignments before loss, and do not prevent an assignment after loss" because

"[t]he purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.") (citations omitted).

85. *Globecon*, 434 F.3d at 171 (quoting *Northern Ins. Co. of N.Y. v. Allied Mutual Ins. Co.*, 955 F.2d 1353, 1358 (9th Cir.1992) (modifications in original)); *Beck–Brown Realty Co. v. Liberty Bell Ins. Co.*, 137 Misc. 263, 241 N.Y.S. 727, 728 (N.Y.Sup.Ct.1930) ("Before loss, the insurer is subjected to a risk, and it is this risk which the insurer may exempt from assignability except upon its own consent. Upon loss, however, the risk disappears and nothing remains except the assured's right to payment—a mere chose in action which may be assigned with the limitations of any other chose in action."); *see also Int'l Rediscount Corp. v. Hartford Accident & Indem. Co.*, 425 F.Supp. 669, 673 (D.Del.1977) (noting in applying Delaware law that "[n]o right of the

As a result, New York law views "the assignment of an accrued insurance claim" to be "the same as assigning a chose in action, and contractual limitations on such assignments are contrary to the public policy of New York." [86] Importantly, this includes a company's assignment of liability insurance for claims arising out of events that have already occurred.[87]

insurer being affected by the assignments of the policies, it would be a mere act of caprice or bad faith for it to take advantage of the stipulation that the transfers were subject to its consent, by withholding such consent, in order to defeat the claim of the assignee").

86. *Tenneco Chems., Inc. v. Employers Mutual Liability Ins. Co.*, 1977 U.S. Dist. LEXIS 16759, at *8 (S.D.N.Y. Mar. 23, 1977); *see also* 3 COUCH ON INS. § 35:8 (noting that provisions explicitly prohibiting an assignment after a loss are generally considered to be void because "it is against public policy to restrict the relation of debtor and creditor by restricting or rendering subject to the control of the insurer an absolute right in the nature of a chose in action"). Although, as described above, Florida law does not govern the Houdaille Policies, these same fundamental policy judgments animate Florida law as well. *See Cont'l Cas. Co. v. Ryan Inc. E.*, 974 So.2d 368, 378 n. 7 (Fla.2008) ("[I]t is a well-settled rule that [anti-assignment provisions do] not apply to an assignment after loss.") (quoting *West Fla. Grocery Co. v. Teutonia Fire Ins. Co.*, 74 Fla. 220, 77 So. 209, 210–11 (1917) (second alternation in original)); *Lexington Ins. Co. v. Simkins Indus., Inc.*, 704 So.2d 1384, 1386 (Fla.1998) ("The purpose of a provision prohibiting assignment is simple—to protect an insurer against unbargained-for risks.").

87. *Texaco A/S v. Commercial Ins. Co. of N.J.*, 1995 WL 628997, at *6 (S.D.N.Y. Oct. 26, 1995) (holding that an anti-assignment clause did not bar the transfer of insurance rights pursuant to a merger), *vacated on other grounds*, 160 F.3d 124 (2d Cir.1998); *Tenneco*, 1977 U.S. Dist. LEXIS 16759, at *8 (holding that an anti-assignment clause did not bar the transfer of liability insurance for pretransfer occurrences). The Excess Insurers have tried to distinguish some of this precedent on the basis that these transfers were pursuant to statutory mergers. But, the focus in these cases is on whether an assignment changes an insurer's bargain. The Excess Insurers have not explained, and I do not perceive, how an asset sale or assignment would increase insured-against risks in a way that a statutory merger would not.

Alternatively, the Excess Insurers have argued that transfers of the Houdaille–Era Insurance Rights actually did, in fact, increase their risks. All of the New York law on this issue, however, is to the contrary, allowing an insured to transfer liability insurance after the underlying liability has occurred. *See Elliott Co. v. Liberty Mut. Ins. Co.*, 434 F.Supp.2d 483, 490 (N.D.Ohio 2006) (applying New York law); *Texaco A/S*, 1995 WL 628997, at *6, *vacated on other grounds*, 160 F.3d 124 (2d Cir.1998); *Tenneco*, 1977 U.S. Dist. LEXIS 16759, at *8. And, as a Delaware judge, I am not empowered to change New York common law. It is worth noting, however, that the facts in this case actually show that there is little increase in insured against risks. Here, the Excess Insurers do not disagree that the actual Houdaille–Era Claims are the same regardless of who holds them. Instead, they argue that they might have to incur increased defense costs in order to protect John Crane, Houdaille, New Viking, and New Warren. First, with respect to John Crane and Houdaille, this argument ignores the fact that an assignment, by nature, divests the assignor of all of its rights in the subject of the assignment. *See TPZ Corp. v. Dabbs*, 25 A.D.3d 787, 808 N.Y.S.2d 746, 751 (N.Y.App.Div.2006) ("Under New York law, an assignment occurs only where the assignor retains no control over the funds, no authority to collect and no power to revoke."); *see also* 6 AM.JUR.2D *Assignments* § 122. Therefore, the Excess Insurers will not face additional costs with respect to John Crane and Houdaille.

And, with respect to the Excess Insurers obligations to protect New Warren and New Viking, Liberty Mutual, which had the same incentives as the Excess Insurers now to encourage efficiency, never objected to these costs. Furthermore, the Excess Insurers are free to use whatever contractual provisions they put in their policies to dictate an efficient defense. In fact, the record shows that covering both New Warren and New Viking does not involve material additional costs. With the exception of each having its own national coordinating counsel, New Warren and New Viking have used the attorneys that Liberty Mutual has chosen. Perritano Aff. ¶ 4. In

Despite the well-established New York law on this subject, the Excess Insurers have advanced a number of arguments why the anti-assignment provisions in the Houdaille Polices are enforceable. In large part, these arguments center on the California Supreme Court's holding in *Henkel Corporation v. Hartford Accident and Indemnity Company.*[88] In that case, the California Supreme Court found that anti-assignment clauses barred a transfer of insurance claims because even though the underlying tort had already occurred, the insured loss had not been reduced to a fixed amount at the time of the assignment.[89] The Excess Insurers now seek to have this court find that New York law is the same.

As a Delaware court applying New York precedent, it is not my place to make innovative extensions of New York law. That is a job for the New York courts and legislature. But, in any event, the distinction that the California Supreme Court drew in *Henkel* simply does not exist in New York case law. Instead, courts applying New York law have treated the "loss" as occurring when liability arose.[90] In this way, New York law on this matter is in accord with the dissent in *Henkel,* which stressed that anti-assignment clauses should not apply in this context because "[t]he risk insured against does not increase because the insurer's duty to defend and indemnify relates to an injury or damage which was suffered by the claimant *prior* to the assignment of benefits to a successor corporation."[91] The majority's conclusion in *Henkel* is also at odds with New York's public policy, because it could hamstring markets for the sale of corporate assets[92] and lead to insufficient recov-

---

fact, in most of the jurisdictions where New Warren and New Viking have both been sued in the same case, this has meant using the same local counsel. *See* Winsbro Aff. (May 5, 2009) ¶ 3, Ex. 8. And, with respect to New Vikings and New Warrens use of distinct national coordinating counsel, the fact that Liberty Mutual agreed to pay for both counsel indicates that this may have actually provided some cost savings. Although Warren Pumps and Viking Pump were owned by the same conglomerate, they were distinct businesses with their own operations and face many claims by different asbestos plaintiffs. It thus makes business sense to have each operation retain its own national coordinating counsel who is familiar with the operation of each distinct business. Put simply, although both New Viking and New Warren will be bound to cooperate with the Excess Insurers in keeping costs down, the kind of cost factors the Excess Insurers posit are not of the kind or magnitude that New York courts would indulge as a basis to permit an insurer to bar an assignment.

88. 29 Cal.4th 934, 129 Cal.Rptr.2d 828, 62 P.3d 69 (2003).

89. *Id.,* 129 Cal.Rptr.2d 828, 62 P.3d at 74.

90. *See Elliott,* 434 F.Supp.2d at 490 ("The vast majority of courts, including courts in Ohio, Pennsylvania, Connecticut, New York and Delaware, hold that no-assignment clauses do not prevent the voluntary assignment of coverage rights under occurrence-based policies for claims related to preassignment occurrences."); *Tenneco,* 1977 U.S. Dist. LEXIS 16759, at *8 (holding that an assignment of liability insurance for events that had already occurred but upon which claims had not yet been asserted was valid).

91. *Henkel,* 129 Cal.Rptr.2d 828, 62 P.3d at 79 (Moreno, J. dissenting) (emphasis in original).

92. The dissent in *Henkel* makes this point particularly well:

A successor company would not be inclined to assume this risk of liability for the torts of a predecessor without also receiving the benefits of the predecessors insurance coverage for presale occurrences. It is highly unlikely that a successor company would be able to obtain insurance coverage for injuries *that have already occurred* before the successor's acquisition of the business. Therefore, the only realistic way in which a successor corporation can obtain insurance coverage for the torts of its predecessor is if

eries for tort plaintiffs in situations when insurance to cover the plaintiffs' claims was bought and paid for.[93]

 Finally, I reject the Excess Insurers' related argument that, at the time of their assignment, the Warren and Viking claims were, as a matter of New York law, too speculative to be assigned. The basis for this argument is a line of New York cases which have limited the assignability of claims based upon ongoing business interruption losses.[94] Those cases, however, rely upon the unique nature of business interruption insurance, which can result in a post-loss assignment increasing the insurer's risks in a way unforeseen at the time of the contracting.[95] For example, if an insured business has suffered a fire and then sells the business along with the business interruption claim, then the insurer must engage in a speculative inquiry into what would have happened if the original insured had continued to run the business, rather than the new owner. That inquiry is different from what the insurer agreed to, which is a fact-based determination of how much business the insured *actually* lost. By contrast, the extent of the Houdaille–Era Claims will be determined in the same way they would have been if Houdaille had continued to operate those businesses as unincorporated divisions.

Admittedly, there is some language in these cases indicating that the reason that business interruption losses are not assignable is because they are "speculative" as opposed to "fixed." [96] And, at the time of the relevant assignments, no one actually knew the full extent of the Houdaille–Era Claims. But, the overriding focus of the

---

the predecessor is able to assign its insurance coverage benefits to the successor. The majority's decision, however, allows insurance companies the ability to veto this necessary assignment of benefits by inserting a no-assignment clause into the insurance policy. Such a rule will have the effect of inhibiting corporate reorganization or sale. *Henkel*, 129 Cal.Rptr.2d 828, 62 P.3d at 80 (Moreno, J. dissenting) (emphasis in original). Enabling efficient exchange appears to be a long-standing public policy rationale for New York law's rule against enforcing anti-assignment provisions in post-loss scenarios. *See, e.g., Courtney v. The New York City Ins. Co.*, 28 Barb. 116 (N.Y.Supr.1858) (giving as reasons for refusing to enforce an anti-assignment provision post-loss the fact that "[the anti-assignment provision] is a positive impediment in the way of the assured, for it forbids him to sell, assign or hypothecate his claim or to realize a dollar towards the reparation of his loss and the renovation of his property" and that such provisions are "manifestly in restraint of the free use and enjoyment of the rights of the assured under the contract").

**93.** *See In re Liberty Mut. Ins. Co. (Hogan)*, 82 N.Y.2d 57, 603 N.Y.S.2d 409, 623 N.E.2d 536, 539 (1993) (not enforcing a "livery provision" in an insurance policy because enforcing the

provision would have been "inconsistent with the sound public policy of this State of ensuring that innocent victims of motor vehicle accidents are compensated for their injuries and losses"); 7A COUCH ON INS. § 104:1 (discussing "the trend of modern public policy favoring the compensation of innocent victims over the preservation of historic legal rules").

**94.** *See, e.g., Holt v. Fid. Phoenix Fire Ins. Co. of N.Y.*, 273 A.D. 166, 76 N.Y.S.2d 398, 399 (N.Y.App.Div.1948) (holding that the owner of a movie theater could not transfer business interruption insurance to the theater's new owner).

**95.** *SR Intl. Business Ins. Co., Ltd. v. World Trade Ctr. Props., LLC*, 375 F.Supp.2d 238, 249 (S.D.N.Y.2005) (noting that an analysis of the business interruption cases "demonstrate[s] courts focus on the risks imposed on insurers both before and after an assignment"); *see also Globecon*, 434 F.3d at 173 (noting that the distinction in *SR International* between speculative and fixed losses "seems to be the correct one under New York law" and citing to cases focusing on whether an assignment actually increased the insurers risk).

**96.** *Id.* at 172.

New York case law is on the insurers not having to insure against more risks than those to which they agreed.[97] Although no one knew the extent of the relevant claims in 1985 and 1988, the mechanism by which the extent of those liabilities would be determined was the same. And, when the cases are read in their totality it is evident that this question, whether the insured against risks are changing, predominates the New York courts' analysis.

For all these reasons, I conclude that the anti-assignment clauses in the Houdaille Policies did not bar Houdaille's assignment of the Houdaille–Era Insurance Rights.[98]

### V. *Allocation Of Liabilities*

The remaining issue to be determined involves the dispute between the Excess Insurers, on the one hand, and New Warren and New Viking, on the other, about how to allocate responsibility for covering asbestos claims that result from Multi– Period Exposure. This question is one that many courts have faced before and takes its usual form, with the insurers favoring a so-called "pro rata" approach, which has the effect of reducing their obligations, and the insureds favoring a so-called "all sums" approach, which tends to provide insureds with fuller coverage.[99]

Although the case law addressing this question is laden with policy discussions, the task before me, as I shall explain, is to determine, using New York principles of contract interpretation, which approach is embraced by the Houdaille Policies. As will be seen, the State of New York has not adopted a rule of common law that imposes either approach on all insurance contracts; rather, New York precedent requires that the court apply traditional principles of insurance contract interpretation to the policies at issue and then apply the approach that results from that in-

**97.** *See, e.g., S.R. Int'l Bus.*, 375 F.Supp.2d at 248 (noting that the principle emerging from the New York cases regarding the anti-assignment analysis examines "whether the risk imposed on an insurer by the assignment of a claim is meaningfully different from that borne by the insurer before such assignment").

**98.** Having read a good deal of fascinating case law regarding the assignability of insurance coverage, I note that even jurisdictions like New York that, as a matter of common law, override anti-transfer policies might consider allowing insurers to impose binding *notice of transfer* provisions that would give the insurers clear notice of the terms of any proposed transfer. That balanced approach might help limit disputes such as this while not unreasonably limiting transfers.

**99.** The leading decision espousing the use of the all sums method of allocation of liability among insurers is *Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). *See also J.H. France Refractories Co. v. Allstate Insurance Co.*, 534 Pa. 29, 626 A.2d 502 (1993) (expressly following *Keene* in the asbestos context); *Goodyear Tire & Rubber Co. v. Aetna Casualty & Surety Co.*, 95 Ohio St.3d 512, 769 N.E.2d 835 (2002) (basing its decision to allocate liability among insurers joint and severally on the "all sums" language in the underlying insurance policies.). The leading case endorsing the pro rata method of allocation is *Ins. Co. of N. Am. v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1225 (6th Cir.1980), *clarified and aff'd on reh'g*, 657 F.2d 814 (6th Cir.1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). *See also Porter v. Am. Optical Corp.*, 641 F.2d 1128, 1145 (5th Cir. 1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) (following *Forty– Eight Insulations* and prorating liability among insurers that provided coverage during the period the injured party was exposed to asbestos); *Owens–Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 650 A.2d 974 (1994) (applying pro rata allocation for public policy reasons upon finding that the plain language of the insurance policies, extrinsic evidence, and the applicable rules of contract construction did not determine whether all sums or pro rata allocation should be applied).

terpretative exercise. As a Delaware judge seeking to discern how a New York court would decide this case,[100] I give great weight to the teachings of New York's state courts, particularly its Court of Appeals, which consistently express a respect for contractual freedom in the insurance context[101] and which use the doctrine of *contra proferentum* to break ties against the insurer and in favor of the insured.[102]

With that framework in mind, I turn the task of determining which allocation method is embraced by the Houdaille Policies.

## A. Occurrence–Based Policies And The Problem Posed By Multi–Period Exposure Cases (Like Those Involving Exposure To Asbestos)

In simple terms, annual comprehensive general liability policies such as the Houdaille Policies are "occurrence-based," meaning that each policy provides coverage for future claims arising from injuries or otherwise liability-generating events or "occurrences" that took place during that policy's term. The Houdaille Policies rely on each others' terms and many of the

---

100. *See, e.g., Monsanto Co. v. C.E. Heath Compensation and Liability Ins. Co.*, 652 A.2d 30, 35 (Del.1994) (holding that "[t]his Court's examination of the present status of the law in Missouri leads us to conclude that the Missouri Supreme Court would follow the majority rule and not read a *pro rata* allocation of coverage into Monsanto's insurance policies."); *Columbia Cas. Co. v. Playtex FP, Inc.*, 584 A.2d 1214, 1218 (Del.1991) (basing the court's deference to the laws of a sister state on principles of comity); *Kahn Bros. & Co., Inc. Profit Sharing Plan and Trust v. Fischbach Corp.*, 1988 WL 122517, at *6–7 (Del.Ch. Nov. 15, 1988) (predicting how a Florida court would interpret Florida law and grounding its prediction upon considerations of comity and the Full Faith and Credit Clause of the U.S. Constitution).

101. *Breed*, 46 N.Y.2d at 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (focusing on the plain language of the contract and reasoning that "[t]his court may not make or vary the contract of insurance to accomplish its notions of abstract justice or moral obligation, since '[e]quitable considerations will not allow an extension of the coverage beyond its fair intent and meaning'") (citations omitted); *see also Weinberg Holman v. Providence Washington Ins. Co.*, 254 N.Y. 387, 390, 173 N.E. 556 (N.Y.1930) ("A plain contract, clear and explicit in its terms, is to be construed by the court. Equitable considerations will not allow an extension of the coverage beyond its fair intent and meaning in order to do raw equity and to obviate objections which might have been foreseen and guarded against, even though the contract to be construed is a policy of insurance."); *see generally*, 2 ERIC MILLS

HOLMES & MARK S. RHODES, HOLMES' APPLEMAN ON INSURANCE § 6.1, at 132 (1996) ("In interpreting insurance contracts . . . a court may adopt a traditional contract analysis premised on the belief that it should not interfere with the terms of private contracts derived from the consent of the parties. 'The policy is a contract and we cannot rewrite it.' Freedom of contract is the basic principle of this method of analysis.") (citations omitted).

102. *Breed*, 46 N.Y.2d at 354, 413 N.Y.S.2d 352, 385 N.E.2d 1280 ("Well recognized is the general rule that ambiguities in an insurance policy are to be construed against the insurer."); *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 361, 357 N.Y.S.2d 705, 314 N.E.2d 37 (N.Y.1974) ("It is fundamental that ambiguities in an insurance policy must be construed against the insurer."); *Goldner v. Otsego Mut. Fire Ins. Co.*, 39 A.D.2d 440, 442, 336 N.Y.S.2d 717 (N.Y.App.Div.1972) ("It is the well-settled law of this State that if an insurance policy or a clause thereof is reasonably susceptible of two different constructions, the one most favorable to the insured must be adopted."); *Hartol Prods. Corp. v. Prudential Ins. Co. of Am.*, 290 N.Y. 44, 49, 47 N.E.2d 687 (1943) ("It is unquestionably the rule that contracts of insurance, like other contracts, are to be 'construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, the terms are to be taken and understood in their plain, ordinary, and proper sense.'") (citations omitted); *see also Baker v. Nationwide Mut. Ins. Co.*, 158 A.D.2d 794, 796, 551 N.Y.S.2d 387 (N.Y.App.Div.1990).

Excess Policies "follow form" to the Umbrella Policies (*i.e.*, the Excess Policies incorporate some or all of the Umbrella Policies' terms). As a result, several of the key provisions relevant to the parties' disputes over the Excess Policies are actually located in the Umbrella Policies, with the Excess Policies incorporating the pertinent provisions.

Importantly for present purposes, those Umbrella Policies provide that:

> [Liberty Mutual] will pay on behalf of the insured *all sums* in excess of the retained limit which the insured shall become legally obligated to pay, or with the consent of [Liberty Mutual], agrees to pay, as damages, direct or consequential, because of:
>
> (a) personal injury,
>
> (b) property damage, or
>
> (c) advertising injury or damage
>
> with respect to which this policy applies and caused *by an occurrence*.[103]

"Occurrence" is defined as *"injurious exposure to conditions, which results in personal injury,* property damage or advertising injury or damage neither expected nor intended from the standpoint of the insured." [104] Personal injury is defined in the Umbrella Policy to mean "personal injury or bodily injury which occurs *during the policy period*." [105] All of the Excess Policies either follow form to this

coverage or have their own provisions that commit to substantively identical coverage.

The liability issue that New Viking and New Warren face is the all too common one. Each manufactured products that incorporated asbestos. Each has been sued by tort plaintiffs, who allege that they were exposed to asbestos by New Viking or New Warren and that injury resulted.

The problem that arises from tort claims like this is that there is no way of determining how to link a plaintiff's asbestos-related injuries—such as asbestosis, pleurisy, mesothelioma, or lung cancer—to a particular period of asbestos exposure.[106] To be concrete, if a tort plaintiff was continuously exposed to asbestos in the workplace from 1972 to 1982, and manifests injury in the form of asbestosis in 1985, there is no reliable method to determine whether any period of exposure was crucial to the resulting medical problems. In a situation where the tort plaintiff worked at three different workplaces during the time period in question and convinced a jury that exposure at each work place was causally related to his total harm, many states would allow the plaintiff to hold each defendant-employer jointly and severally liable for his entire harm.[107] In that circumstance, the plaintiff could recover the entire judgment from any one of the defendants, the question of summing up

---

103. *E.g.*, Winsbro Aff. Ex. 11 at LMVP01199 (emphasis added).

104. *Id.* at LMVP01214 (emphasis added).

105. *E.g., id.* at LMVP01199 (emphasis added).

106. *In re Liquidation of Midland Ins. Co.*, 269 A.D.2d 50, 709 N.Y.S.2d 24, 30 (N.Y.App.Div. 2000) ("There exist at present no medical techniques capable of specifically identifying and quantifying the progression of asbestos-related injury, sickness or disease actually sustained in each year from and after a first exposure to asbestos fiber.").

107. *See, e.g., Lewin v. Am. Export Lines, Inc.*, 224 F.R.D. 389, 395 (N.D.Ohio 2004) (applying joint and several liability in a multi-defendant maritime asbestos case.); *see also Coulter v. Asten Group, Inc.*, 135 Wash.App. 613, 146 P.3d 444, 446 (2006); *see generally* 2 DAN B. DOBBS, THE LAW OF TORTS § 389, at 1087 (2001) (discussing joint and several liability rules in the United States and noting that many states apply joint and several liability); RESTATEMENT (SECOND) OF TORTS § 875 (1979).

among the defendants would be left to them, and, if one of the defendants was bankrupt, the other two defendants would have to absorb the cost of that.[108]

Asbestos claims raise similar problems in the insurance context. Not only is there no reliable way to attribute a resulting medical problem to any particular prior period of asbestos exposure, the resulting medical problems often do not manifest themselves until years after the exposure.[109] Thus, one interpretative question courts have had to face is whether a policy is triggered simply by exposure during the policy period or whether there also has to be some actual manifestation of a resulting medical detriment during the policy period. In order to determine when a particular policy period is triggered, courts have developed four approaches for dealing with the problem of identifying when "long-tail" injuries such as those arising from asbestos exposure have occurred: (1) placing the injury at the time of exposure (the "exposure" theory);[110] (2) placing the injury at the time the resulting disease's symptoms manifest themselves (the "manifestation" theory);[111] (3) deeming the injury to have occurred continuously from exposure until manifestation (the "continuous trigger" theory);[112] and (4) allowing the finder of fact to find injury to have occurred during any period of asbestos exposure so long as the effects of that period of exposure are found to have eventually resulted in an actual and compensable injury (the "injury in fact" theory).[113]

New York law follows the last theory, and generally holds that an occurrence-based policy is triggered upon an "injury-in-fact" to a tort plaintiff.[114] In other words, where contract language, such as that found in the Houdaille Policies, indicates that an "occurrence" is "injurious exposure to conditions, which results in personal injury," then the injury-in-fact theory dictates that the plaintiff's exposure to asbestos attributable to the insured during the policy period triggers the policy. Indeed, the operative language of the Houdaille Policies basically tracks the injury-in-fact theory. New York courts have generally found that a plaintiff who proves that she suffered compensable damage as a result of asbestos exposure is injured during all periods of material exposure and therefore that any policy is triggered if it was in existence when the exposure occurred.[115] Therefore, New York

---

108. *See* DOBBS, *supra*, § 387, at 1082.

109. Michael G. Doherty, *Allocating Progressive Injury Liability Among Successive Insurance Policies*, 64 U. Chi. L.Rev. 257, 257 (1997).

110. *See, e.g., Forty–Eight Insulations*, 633 F.2d at 1223.

111. *See, e.g., Eagle–Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 24–25 (1st Cir.1982).

112. *See, e.g., Keene*, 667 F.2d at 1042–47.

113. *See, e.g., Am. Home Prods. Corp. v. Liberty Mutual Ins. Co.*, 748 F.2d 760, 764–66 (2d Cir.1984)

114. *Cont'l Cas. Co. v. Rapid–American Corp.*, 177 A.D.2d 61, 65–66, 581 N.Y.S.2d 669 (1992); *Am. Home Prods.*, 748 F.2d at 765.

115. *In re Liquidation of Midland Ins. Co.*, 269 A.D.2d 50, 709 N.Y.S.2d 24, 33–34 (N.Y.App. Div.2000); *see also Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1196 (2d Cir.1995) ("[T]he Court held that the plaintiff's claim was enforceable under *all* of the policies issued by the defendant to its insured. This indicates that New York recognizes that whenever the facts show injury during a relevant policy period, the policy applies, even though injury was shown to have occurred in an earlier period covered by a prior policy.") (original emphasis).

law can be seen as treating each asbestos plaintiff's exposure and injury as a single "occurrence" (that triggers all the multiple policies in place during the period of asbestos exposure).[116]

In other words, if a tort plaintiff who was exposed to asbestos from, say, 1972 to 1982, and sustained injuries from that exposure from 1972 to 1982, then that ten year exposure would be considered one occurrence and all of the policies from 1972 to 1982 would be "triggered." That such Multi–Period Exposure triggers multiple policies, however, obviously leads to the question of how an insured like Houdaille can use the triggered policies. Courts have generally resolved the question in one of two ways.

Under the interpretation that New Viking and New Warren favor, the commitment in the Excess Policies to pay "all sums" means that a policy is responsible for all liability that flowed from a covered occurrence. In other words, any policy that covered part of a Multi–Period Exposure is responsible—up to its policy limits—for all of the liability that resulted from the exposure as a whole. For example, imagine the case of a plaintiff who was exposed to asbestos from January 1, 1972 to December 31, 1979 by a Viking Pump product and a jury verdict was entered against New Viking for $1 million to compensate the plaintiff for his asbestos-caused injuries and losses. Further assume that the plaintiff was exposed to asbestos from January 1, 1980 to December 31, 1981 at the workplace of another defendant, but that the defendant was bankrupt, lacked insurance, and, although

judgment was also entered against the second defendant for the same $1 million, the plaintiff could not recover against it. The jury could not and did not allocate its verdict by percentage to specific years of exposure. Under an all sums approach, New Viking could choose a policy year under which to make its claim. For instance, it could submit the $1 million dollar liability to Granite State Insurance Company, which issued the first layer Excess Policy for 1979 (assuming of course that the Primary and Umbrella Policies for 1979 have been exhausted). As long as there was $1 million in coverage left in Granite State's coverage, Granite State would then have to pay out the full $1 million. Then, to the extent that Granite State believes it has borne too much of the liability, it can sue the other insurers for contribution. But, New Viking, as the policyholder, is permitted a full "all sums" recovery from the selected insurer to satisfy the full jury verdict. This method of allocation is therefore often referred to as "all sums" after the wording that it relies upon.[117]

The all sums approach resembles joint and several liability in the sense that the insured may collect against any insurer whose policy is triggered, up to the policy's relevant per-occurrence total limits, in the same way that a plaintiff, if exposed to asbestos by two different defendants in the same case, might collect his entire judgment from one of the defendants and leave the paying defendant to seek contribution from the other defendant in a later action.[118] If that other defendant is insolvent or otherwise incapable of paying, then

116. *See Appalachian Ins. Co. v. Gen. Elec. Co.,* 8 N.Y.3d 162, 173–174, 831 N.Y.S.2d 742, 863 N.E.2d 994 (N.Y.2007) (holding in the context of an asbestos exposure case that each individual's exposure was a separate occurrence).

117. *See, e.g., Keene,* 667 F.2d at 1050 (applying an all sums method of allocation).

118. *See* 2 Dobbs, *supra,* § 386, at 1078–80 (discussing contribution among joint tortfeasors).

the defendant, who paid the judgment, and not the plaintiff, bears the cost of the other defendant's inability to pay.[119]

The Excess Insurers, by contrast, argue in favor of an interpretation whereby any given insurer, having only agreed to insure Houdaille for a fixed period of time, is only responsible for some "pro rata" share of the liability the insured owes to an asbestos plaintiff who suffered compensable harm as a result of a Multi–Period Exposure. Under such a method of allocation, a court must somewhat arbitrarily divvy up the total liability of the insured among its insurers, treating them as if they were divisible injuries.

To return to the example of $1 million in liability for injuries sustained between 1972 and 1982, a court would have to determine how to divide up that $1 million in liability. For example, if it applied the so-called "time on the risk" method for prorating liability, the court would divide up liability according to what percentage of the injury the insurance policy covered.[120] In the first instance, because New Viking was not responsible for exposure from January 1, 1980 to December 31, 1981, there would arise the question of whether it, despite being jointly and severally liable for $1 million, would suffer a reduction of $200,000. That is, the question arises of whether New Viking's insurers would get a credit that New Viking itself, as a tort defendant, would not get.

If the pro rata approach went that far, New Viking would find itself underinsured. For example, if the pro rata approach only operated to reduce the insurers' liability based on the years New Viking was responsible for exposure, each policy year would be allocated 10%, or $100,000, in liability. Granite State, as the insurer for 1979 would then only have to pay that $100,000 to fulfill its commitment to New Viking, regardless of whether New Viking had any coverage in the other years.[121] If New Viking had such coverage, it might be able to collect from the other insurers but only after giving them credit for the same sort of pro rata reduction, and, as we shall see, only if other contractual provisions do not bar recovering if another policy has paid.[122] Moreover, the obvious question arises whether the insured, under this pro rata approach, must pay all the multiple insurers' deductibles if they would otherwise be applicable, in order to get the reduced amount the pro rata approach leaves to recover.

For obvious reasons, the all sums approach tends to be favored by insured and the pro rata approach by insurers. The all sums approach lets the insured pick a policy and use it up to the policy limits, and leave questions of apportionment to be fought out later among the insurers themselves. The pro rata approach gives insurers material reductions in their exposure by shifting from the insurer to the insured the risk of periods of exposure when the

---

119. *Id.* § 387, at 1082 (discussing contribution where one jointly and severally-liable defendant is bankrupt).

120. *See Consol. Edison Co. of New York v. Allstate Insur. Co.,* 98 N.Y.2d 208, 225, 746 N.Y.S.2d 622, 774 N.E.2d 687 (2002) (describing different methods of prorating including time on the risk).

121. None of the Excess Insurers has discussed how this allocation should be done.

There are several different ways in which one could try and allocate ten years of exposure between potentially as many policies. *See Consol. Edison,* 746 N.Y.S.2d 622, 774 N.E.2d at 695 ("We recognize—as did the trial court—that there are different ways to prorate liability among successive policies.").

122. *See, e.g., Forty–Eight Insulations,* 633 F.2d at 1225 (applying pro rata allocation).

insured lacked coverage or the insurer for that period went bankrupt, or during which another defendant was responsible for exposure to the insured, even if the insured itself was held jointly and severally responsible for the plaintiff's entire harm.

Given these differences in result, it is unsurprising that various courts have expressed a preference, on policy grounds, for one method over the other.[123] Courts more concerned with guaranteeing full compensation to tort plaintiffs and holding insurers accountable up to the full policy limits when a policy is triggered, tend to favor the all sums method.[124] By contrast, other courts have thought it unfair to hold a particular insurer fully responsible for an asbestos judgment against its insured when that insurer only had the coverage for, say, a year of the exposure period.[125] These courts have tended to favor the pro rata approach. Likewise, courts keenly aware of the complexities and costs of insurance coverage litigation have expressed the view that the all sums method simply defers the eventual fight among insurers about contribution to a later proceeding, and that the pro rata method is efficient because it resolves the question of what responsibility all of the insured's insurers owe at the same time as the insured's right to coverage is established.[126]

■ This would be a simple case had the New York Court of Appeals adopted a firm position on one side or the other of this policy divide, by declaring that regardless of what the relevant insurance policies said, New York common law mandated that one of the particular approaches be followed. But the New York Court of Appeals has done no such thing. Instead, that court and other New York state court cases make clear that, in a case governed by New York law, the question of which of the basic methods applies depends on which is the most faithful to the bargain

123. *See U.S. Fidelity & Guar. Co. v. Treadwell Corp.*, 58 F.Supp.2d 77, 95–96 (S.D.N.Y.1999) (discussing the division between courts regarding which method to apply).

124. *See, e.g., Keene*, 667 F.2d at 1041 ("In construing the policies coverage of liability for asbestos-related diseases, our objective must be to give effect to the policies dominant purpose of indemnity. An insurance contract represents an exchange of an uncertain loss for a certain loss. In a comprehensive general liability insurance policy, the uncertain loss is the possibility of incurring legal liability, and the certain loss is the premium payment. By issuing the policy, the insurer agrees to assume the risk of the insured's liability in exchange for a fixed sum of money. At the heart of the transaction is the insureds purchase of certainty—a valuable commodity.") (internal citations omitted); *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 491–94 (Del. 2001).

125. *See, e.g., Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 322–23 (2d Cir.2000) (referring to all sums allocation as "intuitively suspect" and reasoning that pro rata allocation has the advantage of "forc[ing] an insured to absorb the losses for periods when it self-insured and can prevent it from benefiting from coverage for injuries that took place when it was paying no premiums"); *In re Prudential Lines Inc.*, 158 F.3d 65, 84 (2d Cir.1998); *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1392 (E.D.N.Y.1988).

126. *See In re Prudential Lines*, 158 F.3d at 85 (finding that some courts "see [pro rata] allocation as the most efficient way to assign liability among policies, reasoning that any contribution proceeding will involve many of the same issues that are raised in the initial liability proceeding, and that it is more efficient to deal with these issues in a single proceeding"); *see also Olin*, 221 F.3d at 323 ("[W]here the policies triggered are provided by multiple insurers, [pro rata] allocation avoids saddling one insurer with the full loss, the burden of bringing a subsequent contribution action and the risk that recovery in such an action will prove to be impossible because, for instance, the insurer of other triggered policies is unable to pay.").

struck by the parties to the insurance contracts at issue: "[w]hether the insurer's duty turns on [all sums] or 'pro-rata' liability will depend on the language of the policy." [127] Put bluntly, the policy predilections of judges are not what is important, what is important is which method best honors the parties' agreement.[128]

In interpreting insurance contracts, New York uses a familiar approach.

New York law first examines the language of the policy to determine the scope of its coverage.[129] Insurance contracts must be interpreted to effectuate the intent of the parties.[130] Courts apply the normal principles of contract interpretation in interpreting the policy.[131] This includes the rule that the court must read the contract as a whole in order to give each provision effect.[132] After that is done, the court should give effect to any clear meaning

**127.** See Sid Harvey Indus., Inc. v. Commerce & Indus. Ins. Co., 2006 WL 4069806, at *4 (N.Y.Sup.Ct. Aug. 10, 2006); Consol. Edison, 746 N.Y.S.2d 622, 774 N.E.2d at 693; County of Columbia v. Cont'l Ins. Co., 83 N.Y.2d 618, 612 N.Y.S.2d 345, 634 N.E.2d 946 (1994) (focusing its inquiry on the language of the insurance policies at issue); Rapid–American, 177 A.D.2d at 72, 581 N.Y.S.2d 669 (focusing its inquiry on the language of the insurance policies in question); Olin, 221 F.3d at 323–24.

**128.** Like New York, Florida does not have a rule of public policy that requires, regardless of the insurance policy terms, the application of either the pro rata or the all sums method. Rather, it appears that Florida would address the question of which method of allocation would apply to the Houdaille Policies by examining those Policies under traditional insurance contract interpretation principles. CSX Transp., Inc. v. Admiral Ins. Co., 1996 WL 33569825, at *7–8 (M.D.Fl.1995) (adopting the all sums method of allocation after examining the insurance policies in question and noting that, unlike courts in other states, Florida courts had not addressed the issue of whether the all sums or the pro rata methodology should be applied under Florida law); see also Allstate Ins. Co. v. TIG Ins. Co., 711 So.2d 84 (Fla.Dist.Ct.App.1998) (focusing the allocation inquiry in a contribution action on the language of the policies in question). As noted earlier, see notes 37–42 and accompanying text, Florida applies the same general approach to insurance policy interpretation as New York, and there is no reason to believe the application of Florida law would yield a different result.

**129.** Raymond Corp. v. Nat'l Union Fire Ins. Co., 5 N.Y.3d 157, 162, 800 N.Y.S.2d 89, 833 N.E.2d 232 (N.Y.2005) ("In determining a dispute over insurance coverage, we first look to the language of the policy.") (citations omitted); Travelers Indem. Co. v. Commerce & Indus. Ins. Co. of Canada, 36 A.D.3d 1121, 1122, 828 N.Y.S.2d 658 (N.Y.App.Div.2007) ("When addressing an insurance coverage dispute, a court looks first to the language of the policy."); Consol. Edison, 746 N.Y.S.2d 622, 774 N.E.2d at 693 (noting that "[i]n determining a dispute over insurance coverage, we first look to the language of the policy").

**130.** Madawick Contracting Co. v. Travelers Ins. Co., 307 N.Y. 111, 119, 120 N.E.2d 520 (N.Y.1954) ("[W]ords and phrases as used in particular contracts are to be interpreted in accordance with the meaning with which they have been invested by the parties."); see also Breed, 46 N.Y.2d at 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (noting that an insurance policy "is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed"); Hartford Ins. Co. of Midwest v. Halt, 223 A.D.2d 204, 212, 646 N.Y.S.2d 589 (N.Y.App.Div. 1996) ("In interpreting the contract, the intent of the parties, as expressed in the language of the policy, must control.").

**131.** State v. Am. Mfrs. Mut. Ins. Co., 188 A.D.2d 152, 593 N.Y.S.2d 885, 886 (N.Y.App. Div.1993) (applying "the well accepted standard that principles generally applicable to contract interpretation apply equally to insurance contracts").

**132.** Cont'l Ins. Co., 612 N.Y.S.2d 345, 634 N.E.2d at 950 ("An insurance contract should not be read so that some provisions are rendered meaningless.").

that emerges.[133] The determination of whether an insurance policy is ambiguous is a question of law for the court to decide,[134] and the rule is that a contract is ambiguous where it is susceptible to two different, reasonable readings.[135]

 Where the policy language is ambiguous the court may consider the extrinsic evidence in support of a particular interpretation.[136] If an ambiguity arises that cannot be reconciled with the parties' apparent intentions, then the language is interpreted in accordance with the reasonable expectations of the insured.[137] To do so, New York courts commonly employ the *contra proferentum* rule and resolve ambiguities against the insurer.[138] The *contra proferentum* rule requires that a "construction favorable to the insurer will only be sustained where it is the sole construction which can fairly be placed upon the words employed." [139] This rule has been found to have a "special vigor" when applied to policies that, by their own terms, are denominated as "comprehensive gener-

133. *Travelers Indem. Co.*, 36 A.D.3d at 1122, 828 N.Y.S.2d 658 ("Unambiguous provisions of a policy are given their plain and ordinary meaning.") (citing *Lavanant v. General Acc. Ins. Co. of Am.*, 79 N.Y.2d 623, 629, 584 N.Y.S.2d 744, 595 N.E.2d 819 (N.Y.1992)).

134. *Breed*, 46 N.Y.2d at 353, 413 N.Y.S.2d 352, 385 N.E.2d 1280; *Greaves v. Pub. Serv. Mutual Ins. Co.*, 5 N.Y.2d 120, 125, 181 N.Y.S.2d 489, 155 N.E.2d 390 (N.Y.1959); *Miller v. Cont'l Ins. Co.*, 40 N.Y.2d 675, 678, 389 N.Y.S.2d 565, 358 N.E.2d 258 (N.Y. 1976); *Vargas v. Ins. Co. of N. Am.*, 651 F.2d 838, 839–40 (2d Cir.1981); *In re Prudential Lines*, 158 F.3d at 77.

135. *State v. Home Indem. Co.*, 66 N.Y.2d 669, 671, 495 N.Y.S.2d 969, 486 N.E.2d 827 (N.Y. 1985) (noting that an insurance contract is ambiguous if "susceptible of two reasonable interpretations"); *MDW Enters., Inc. v. CNA Ins. Co.*, 4 A.D.3d 338, 772 N.Y.S.2d 79, 82 (N.Y.App.Div.2004) ("The test for ambiguity is whether the language in the insurance contract is susceptible of two reasonable interpretations.") (quotations omitted).

136. *Home Indem. Co.*, 66 N.Y.2d at 671, 495 N.Y.S.2d 969, 486 N.E.2d 827 ("If, however, the language in the insurance contract is ambiguous and susceptible of two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction."); *Acorn Ponds, Inc. v. Hartford Ins. Co.*, 105 A.D.2d 723, 724, 481 N.Y.S.2d 392 (N.Y.App. Div.1984); *In re Prudential Lines*, 158 F.3d at 77.

137. *Breed*, 46 N.Y.2d at 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280.

138. *Tonkin v. Cal. Ins. Co. of San Francisco*, 294 N.Y. 326, 328–29, 62 N.E.2d 215 (N.Y. 1945) (noting the "well settled principle 'that if a policy of insurance is written in such language as to be doubtful or uncertain in its meaning, all ambiguity must be resolved in favor of the policy holder and against the company' ") (citing *Hartol*, 290 N.Y. at 49, 47 N.E.2d 687); *Cee Jay Realty Corp. v. Aetna Cas. & Sur. Co.*, 37 A.D.2d 535, 321 N.Y.S.2d 944, 946 (N.Y.App.Div.1971) ("[A]ny ambiguity is to be resolved against the author of the policy, namely, the insurer."); *In re Prudential Lines*, 158 F.3d at 77; *Treadwell*, 58 F.Supp.2d at 103 (quoting *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 697 (2d Cir.1998) ("[T]he *contra proferentum* rule ... states that 'where a policy of insurance is so framed as to leave room for two constructions, the words used should be interpreted most strongly against the insurer.' ")).

139. *Cantanucci v. Reliance Ins. Co.*, 43 A.D.2d 622, 349 N.Y.S.2d 187, 191 (N.Y.App.Div. 1973), *aff'd mem.* 35 N.Y.2d 890, 364 N.Y.S.2d 890, 324 N.E.2d 360 (N.Y.1974); *see also Vargas*, 651 F.2d at 840 ("The insurer bears a heavy burden of proof, for it must 'establish that the words and expressions used not only are susceptible of the construction sought by [the insurer] but that it is the only construction which may be placed on them.' "); *Sincoff v. Liberty Mutual Fire Ins. Co.*, 11 N.Y.2d 386, 390, 230 N.Y.S.2d 13, 183 N.E.2d 899 (N.Y.1962) (insurer must show that its construction is the "only one that fairly could be placed upon the policy" and that insured's construction is unreasonable).

al liability policies."[140] The Houdaille Policies are such policies.

This method of interpretation[141] is reflected in an abundance of insurance decisions by New York state courts and it is the one I follow here. In so approaching the issue, I explicitly eschew reliance on a contrary approach taken by certain federal court decisions that purport to apply New York law. In those decisions, rather than using the well-accepted New York rule that doubts about coverage should be resolved against the insurer and in favor of the insured, federal courts have resolved ambiguities in favor of the approach the court believed was most consistent with good "public policy" and "equit[y]."[142] Largely devoid from those decisions was any rooting of these policy predilections in New York statutory law or decisions of the New York state courts. Rather, these decisions involve a free-wheeling consideration of what New York policy should be, in a manner that is rather surprising given the Erie doctrine.[143] This is not to say that these decisions do not make well-reasoned arguments on one side of a controverted legal policy matter, it is simply to say that my role is to apply New York law in the manner most faithful to the teachings of its own courts.[144] Those

140. *National Screen Serv. Corp. v. U.S. Fidelity and Guar. Co.*, 364 F.2d 275, 279–80 (2d Cir.1966); *see also Uniroyal*, 707 F.Supp. at 1377.

141. The New York approach is similar to that taken by many other jurisdictions in determining whether particular policies embrace an all sums or pro rata method of allocation. *See* 1 BARRY R. OSTRAGER & THOMAS R. NEWMAN, HANDBOOK ON INSURANCE COVERAGE DISPUTES § 1.01[a]-[c] (14th ed. 2008) (indicating that this interpretive approach, which looks to the insurance policies' language, examines extrinsic evidence, and, if necessary, employs *contra proferentum*, is used by courts throughout the United States).

142. *Olin*, 221 F.3d at 323–24 (Noting that the courts "look first to the language of [the] policies" and that "[where] the language is inconclusive, however, we turn to public policy and equitable considerations"); *see also In re Prudential Lines*, 158 F.3d at 85. For example, the federal courts have considered whether (1) self-insurance would lead, under an all sums approach, to imposing liability on an insurer for claims arising from periods during which the insured did not pay for coverage; (2) requiring the insurer to seek contribution later from other insurers, under an all sums approach, would inefficiently duplicate effort and expense by retrying many of the same issues that arose in the immediate proceeding; (3) whether an all sums approach would render the insurer liable for any accidents arising from the insured's intentional activity; and (4) a pro rata approach would burden the insured by multiplying the number of deductibles applicable to each claim. *See, e.g., Olin*, 221 F.3d at 324; *In re Prudential Lines*, 158 F.3d at 86.

143. The Erie doctrine generally stands for the argument that federal courts sitting in diversity cases shall attempt to predict what the State's highest court would do if the issue is unsettled and will avoid making policy-based innovations about legal issues within the authority of the States, not the federal government. *See Erie R.R. Co., v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the state."); *see generally* 19 CHARLES WRIGHT, ARTHUR MILLER & EDWARD COOPER, FEDERAL PRACTICE AND PROCEDURE § 4503-04, at 18–50 (2009).

144. *Id.*, § 4507, at 126–27 ("[I]n divining and applying the law of the forum state in diversity of citizenship cases, each federal court—whether it be a district court or an appellate court—functions as a proxy for the entire state court system, and therefore must apply the substantive law that it conscientiously believes would have been applied in the state court system, which includes the state appellate tribunals. In other words, the federal court must determine issues of state law as it believes the highest court of the state would determine them."). The constitutional concern animating the Erie decision and its progeny—namely, that the outcome of litigation in

teachings instruct me to stick to the method of contract interpretation that New York courts generally apply to insurance coverage disputes, and not to adopt a tie-breaking rule based on judge-made policy determinations.

As it happens, the New York courts' contract-focused approach to the allocation question is exemplified by the leading case on this issue, the New York Court of Appeals' decision in *Consolidated Edison*.[145] There, the issue was whether liability for environmental contamination from a 19th century manufactured gas plant should be allocated among insurers on an all sums or a pro rata basis. To resolve this issue, the court framed its central task as an exercise in contract interpretation.[146] Accordingly, the court examined ConEd's insurance policies, which included both an indemnity "for *all sums* which the insured shall be obligated to pay by reason of the liability" and a limitation that "[t]his policy applies only to 'occurrences' ... happening *during the policy period*."[147] Finding this language unambiguous, the court held that "[p]ro rata allocation under these facts, while not explicitly mandated by the policies, is consistent with the language of the policies."[148] The court reasoned that applying all sums allocation would contravene the requirement under New York law that insurance policies be construed in a way that "affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect"[149] by reading the "during the policy period" qualification out of the contract.[150]

---

federal court should not substantially differ from the outcome of litigating the same case in state court—is identical to cases like this. *See Guar. Trust Co. of N.Y. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) ("[T]he intent of [the *Erie*] decision was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be tried in a State court."). Under principles of comity and the Constitution's Full Faith and Credit Clause, it is my duty to respect our sister state New York by applying its law in the manner most faithful to my understanding of how the New York Court of Appeals would. *See Columbia Cas. Co.*, 584 A.2d at 1218 (basing the court's deference to the laws of a sister state on principles of comity); *Kahn Bros.*, 1988 WL 122517, at *6–7 (predicting how a Florida court would interpret Florida law based upon considerations of comity and the Full Faith and Credit Clause); *McDermott*, 531 A.2d at 218 (basing the court's deference to the foreign law governing a corporation on principles of comity and on the Constitution's Full Faith and Credit Clause, in the case of U.S. corporations, and the Commerce Clause, in the case of non-U.S. corporations). Although this approach has a predictive, uncertain quality, it reminds one who is doing his job with fidelity of the need to hew closely to the statutes of New York and the teachings of the New York courts, particularly those of its highest court.

145. *Consol. Edison*, 746 N.Y.S.2d 622, 774 N.E.2d 687.

146. *Id.*, 746 N.Y.S.2d 622, 774 N.E.2d at 693 ("In determining a dispute over insurance coverage, we first look to the language of the policy.").

147. *Id.* (original emphasis).

148. *Id.*, 746 N.Y.S.2d 622, 774 N.E.2d at 695.

149. *Id.*, 746 N.Y.S.2d 622, 774 N.E.2d at 693 (citing *Hooper Assoc. v. AGS Computers*, 74 N.Y.2d 487, 493, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989)).

150. *Id.*, 746 N.Y.S.2d 622, 774 N.E.2d at 695. Notably, the *Consolidated Edison* court explicitly differentiated the Delaware Supreme Court's opinion in *Hercules*, which applied the all sums method of allocation to excess insurance policies because the insurance policies there included a non-cumulation provision. *Id.*, 746 N.Y.S.2d 622, 774 N.E.2d at 694 ("The authorities cited by Con Edison

As will be seen, the *Consolidated Edison* decision reaches an outcome different than I reach here. But the critical point is *why* it reached the result. In determining that the particular policy in question required the application of the pro rata approach, the New York Court of Appeals did not engage in an extended public policy analysis (or even any at all). It simply decided that the insurance policy in question was best read as embracing the pro rata method of allocation.

Before turning to an examination of the Houdaille Policies themselves, I pause to note that the linguistic analysis in *Consolidated Edison* is extremely abbreviated and, at least to this mind, hardly compelled by words "during the policy period." At least as applied to asbestos exposure cases, the words "during the policy period" do not shed much light on what method of allocation is intended. If, as appears to be the case, a policy would be deemed triggered under New York law simply because there was material asbestos exposure during the policy period,[151] the use of the "during the policy period" language does not itself answer the key question, which is whether, in the case of a plaintiff whose damages cannot be precisely allocated to any particular period of exposure, the in-

surer faces the same sort of joint and several liability that the insured would in the same predicament. That is, it is not at all clear why the "during the policy period" language would be seen as limiting an insurer's responsibility to its insured for covering an asbestos claim if the insured itself was held liable for that claim under ordinary tort principles, even if another defendant was also liable and other insurers covered other years. Just like the defendant itself, so long as the exposure during the insurer's policy period was found to have caused the plaintiff's indivisible harm, it is not clear why the insurer gets to escape paying the policy limits so long as the plaintiff's damage is equal to or greater than those limits.

In such a situation, the insurer is in no different predicament than a defendant found jointly and severally liable with another defendant, and who is chosen by the plaintiff as the defendant from which the plaintiff seeks to recover.[152] This is especially the case when any reductions in the insured's liability by the jury (*e.g.*, for smaller so-called "time on the risk") also benefits the insurer and when the insurer itself can seek contribution from other insurers if it believes they are also responsi-

---

are, however, largely distinguishable, *either because of different policy language* or because of different choices by the insured regarding whether to self insure. . . .") (citing *Hercules*, 784 A.2d at 494) (emphasis added).

**151.** *See Cont'l Cas.*, 80 N.Y.2d at 650–51, 593 N.Y.S.2d 966, 609 N.E.2d 506; *Allstate Insurance Co. v. Colonial Realty Co.*, 121 Misc.2d 640, 468 N.Y.S.2d. 800 (N.Y.Sup.Ct.1983) (holding that infant's exposure to lead-based paint chips was an occurrence); *Maryland Cas. Co. v. W.R. Grace & Co.*, 23 F.3d 617, 627 (2d Cir.1993) (finding that, in a case involving property damage, that "damage-in-fact occurs upon installation in buildings of products containing asbestos.") (citing *Sturges Mfg. Co. v. Utica Mut. Ins. Co.*, 37 N.Y.2d 69, 371 N.Y.S.2d 444, 332 N.E.2d 319 (1975); *Marine*

*Midland Servs. Corp. v. Samuel Kosoff Sons, Inc.*, 60 A.D.2d 767, 768–69, 400 N.Y.S.2d 959 (N.Y.App.Div.1977)).

**152.** *See Consol. Edison*, 98 N.Y.2d at 222, 746 N.Y.S.2d 622, 774 N.E.2d 687 (describing all sums allocation as allowing "the indemnifying insurer [to] seek contribution from the other insurers who also provided coverage during the relevant period. This is referred to as 'joint and several allocation,' by analogy to joint and several tort liability."). Joint and several liability has been limited in a number of jurisdictions over the last twenty years. *See* 2 Dobbs, *supra*, § 389, at 1085–87. Like many other states, however, New York has maintained joint and several liability, except for tortfeasors whose comparative fault is below a 50% threshold. N.Y. CPLR § 1601.

ble. Given that New York has a long tradition of interpreting ambiguous insurance contracts against the insurer, the terse reasoning in *Consolidated Edison* suggests that the New York Court of Appeals did not intend that decision to establish a bright-line ruling that the pro rata method of allocation would govern all insurance contracts based on New York law. Rather, it suggests that the court was focused on interpreting a particular policy involving particular risks, not establishing a broad policy approach integrating all relevant considerations.

I note this issue not to quibble with the ultimate holding in *Consolidated Edison,* but only to highlight that the decision dealt with the words "during the policy period" in a particular case, and without consideration of broad public policy issues. What is outcome determinative in this case is that, as we will now see, the parties to the Houdaille Policies were, unlike what appears to have been the case in *Consolidated Edison,* explicitly aware of the possibility that a tort plaintiff could suffer compensable damages on account of Multi–Period Exposure to asbestos, and crafted specific contractual provisions designed to address those circumstances. In New York, the fact that one decision held that a particular policy embraced the pro rata approach does not make New York a "pro rata state." [153] New York is a state that focuses on giving effect to the parties'

bargain; contractual freedom is the key public policy consideration. [154]

██ Following New York's contract-focused analytical framework, I conclude that an all sums approach is the one embraced in the Houdaille Policies. First, important policy language—namely the inclusion of non-cumulation and prior insurance provisions—differentiates this case from the policy examined in *Consolidated Edison* and leads me to conclude that the Houdaille Policies unambiguously provide for all sums allocation. Second, even if the language of the policies were ambiguous, the only substantial extrinsic evidence offered by the parties weighs in favor of the use of the all sums method. Finally, even if the extrinsic evidence did not resolve the ambiguity in favor of the all sums approach, the principle of *contra proferentum* requires resolving the remaining uncertainty in favor of the insureds.

B. *The Language Of The Policies Is Consistent With An All Sums Approach And Inconsistent With The Pro Rata Approach*

The interpretive problem in this case is similar to that in the many "all sums versus pro rata" disputes that exist. Despite the involvement of sophisticated parties, the insurance contracts at issue do not address how to allocate responsibility for

---

153. *See, e.g., Spaulding Composites Co. v. Aetna Cas. & Sur. Co.,* 176 N.J. 25, 819 A.2d 410, 422 (2003) (holding that provisions inconsistent with the pro rata methodology are not enforceable as a matter of New Jersey public policy).

154. *See Sid Harvey,* 2006 WL 4069806, at *4 ("Whether the insurers duty turns on [all sums] or pro-rata liability will depend on the language of the policy."); *Madawick,* 307 N.Y. at 119, 120 N.E.2d 520 (noting that "words and phrases as used in particular contracts are to be interpreted in accordance

with the meaning with which they have been invested by the parties" and that "[t]he ascertainment of the substantial intent of the parties is the fundamental rule in the construction of all agreements") (citing *People ex rel. New York Central & Hudson River R.R. v. Walsh,* 211 N.Y. 90, 105 N.E. 136 (N.Y.1914)); *Consol. Edison,* 746 N.Y.S.2d 622, 774 N.E.2d at 693 (beginning a determination of the appropriate allocation methodology under an insurance policy by noting that "[i]n determining a dispute over insurance coverage, we first look to the language of the policy").

claims that involve injuries from Multi–Period Exposure in an ideally plain manner. Thus, as in most of these cases, both the insureds and the insurers are able to point to some language that, at first blush, suggests that their approach to allocation is the one embodied in the Policies. What is of overriding importance here, however, is that a close, holistic reading of the Policies' language reveals a clear and unambiguous intention to allocate liabilities on an all sums basis.

The Excess Insurers' textual argument on allocation involves a very narrow focus on how the Policies define injuries. Specifically, personal injury is defined in the Umbrella Policy to mean "personal injury or bodily injury which occurs *during the policy period.*" [155] According to the Excess Insurers, this is important because the term personal injury is used in the Umbrella Policies to define Houdaille's insurance rights, with Liberty Mutual promising to pay "all sums in excess of the retained limit which the insured shall become legally obligated to pay . . . because of: (a) personal injury . . . with respect to which this policy applies and caused by an occurrence." [156] Similarly, as noted above, under the Umbrella Policies, an "occurrence" requires "injurious exposure to conditions which results in personal injury . . . neither expected nor intended from the standpoint of the insured." [157] Some of the Excess Policies also have their own definitions which define an occurrence in a way

requiring injury during the policy period. [158]

The Excess Insurers argue that the combined import of all this text is that the parties only intended for the Excess Insurers to protect Houdaille from liability for injuries that happened during the policy period. To the extent that an asbestos plaintiff experienced a Multi–Period Exposure, the Excess Insurers argue that any single insurer is only responsible for the injury caused during its respective policy period and that any of the harm resulting from exposure at other periods is a separate injury that falls under a different policy. [159] Accordingly, in order to give effect to that commitment, the Excess Insurers argue that any liability must be pro-rated among the policies. This is despite the reality that, in the case of an asbestos plaintiff suffering from compensable injuries due to Multi–Period Exposure, there is no reliable basis to allocate portions of the harm to the various periods of exposure.

Considered in isolation, the Excess Insurers' argument appears to be one that I might be required to accept as dictated by *Consolidated Edison.* As here, the court in *Consolidated Edison,* addressed how to allocate liability in an insurance policy that defined an occurrence as "an event, or continuous or repeated exposure to conditions, which causes injury, damage or destruction *during the policy period.*" [160] Based upon that language, the court held that all sums allocation "is inconsistent

---

155. *See, e.g.,* Winsbro Aff. Ex. 11 at LMVP01199 (emphasis added).

156. *See, e.g., id.*

157. *See, e.g., id.* at LMVP01214.

158. *See, e.g.,* Winsbro Aff. Ex. 5 at VP–EX000799.

159. *See* Letter from John S. Spadaro to the Honorable Leo E. Strine, Jr. at 3 (Aug. 7,

2009) ("Applying a pro rata allocation methodology . . . [the presumption is that] long-tail asbestos bodily injuries are divisible, such that, although spread across triggered policies, there is a separate injury that takes place solely within each triggered policy.").

160. *Consol. Edison,* 746 N.Y.S.2d 622, 774 N.E.2d at 693 (quotations omitted).

with the unambiguous language of the policies before us." [161]

In stark contrast to the narrow policy language considered in *Consolidated Edison*, the Houdaille Policies, however, also contain clauses that make clear that the language "during the policy period" simply requires that the insured's liability be attributable to an occurrence during the policy period and not that the liability did not result at all from events outside of the policy period. These clauses address cases such as those involving tort plaintiffs who were exposed to asbestos over multiple policy periods and operate to ensure that the insured does not get to stack multiple policies together in a way that subjects the insurer to excessive liability. Specifically, all of the Excess Policies either follow form to a "Non–Cumulation Provision" within an Umbrella Policy or themselves have a "Prior Insurance Provision." Under these clauses, recovery under one policy reduces an insured's recovery from policies in effect in other periods for the same occurrence (*e.g.*, continuous asbestos exposure), and an insurer must pay for injuries caused by that occurrence that continues into other periods. These Non–Cumulation and Prior Insurance Provisions cannot sensibly be applied within a pro rata allocation scheme. As a result, the use of a pro rata approach would require the court to nullify these clauses and rewrite the parties' agreement.

The Umbrella Policies all contain the following Non–Cumulation Provisions:

If the same occurrence gives rise to personal injury, property damage or ad-

vertising injury or damage *which occurs partly before and partly within any annual period of this policy,* the each occurrence limit and the applicable aggregate limit or limits of this policy shall be reduced by the amount of each payment made by [Liberty Mutual] with respect to such occurrence, either under a previous policy or policies of which this is a replacement, or under this policy with respect to previous annual periods thereof.[162]

Twenty-eight of the Excess Policies follow form to this language.

Similarly, seventeen of the Excess Policies, and all of the Policies which do not incorporate the Non–Cumulation Provisions, have substantively identical Prior Insurance Provisions which generally state that:

It is agreed that if *any loss covered hereunder is also covered in whole or in part under any other excess Policy issued to the Insured prior to the inception date hereof,* the limit of liability hereon stated in the Items 5 and 6 of the Declarations shall be reduced by any amounts due to the Insured on account of such loss under such prior insurance.

Subject to the foregoing paragraph and to all the other terms and conditions of this Policy *in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of termination of this Policy* the Company will continue to protect the Insured for liability in respect of such personal injury or proper-

161. *Id.,* 746 N.Y.S.2d 622, 774 N.E.2d at 694; *see also id.,* 746 N.Y.S.2d 622, 774 N.E.2d at 695 (holding that all sums allocation "is not consistent with the language of the policies providing indemnification for 'all sums' of liability that resulted from an accident or occurrence '*during the policy period'* ") (emphasis in original); *Stonewall,* 73 F.3d at

1203 (finding language that limits recovery to injuries "which occur[ ] during the policy period" to be consistent with pro rata allocation).

162. *See, e.g.,* Winsbro Aff. Ex. 11 at LM–VP01200.

ty damage without payment of additional premium.[163]

The effect of these clauses is to keep an insured from "stacking" coverage so as to exceed the limits of individual policies.[164] That is to say, they prevent an insured from submitting claims under several different policies so that it can evade the per occurrence limits in its insurance policies. For example, under an all sums scheme in which an insured had a $500,000 per occurrence limit but has been found liable for $1 million arising out of an occurrence over two, one-year policy periods, these types of provisions keep an insured from claiming $500,000 on each policy period and thus being able to recover twice its normal per occurrence limit. In so doing, the Houdaille Policies make the logical, although not required, arrangement that, when an insured seeks to recover from different policies covering the same injury, the insured cannot recover in total above the highest per occurrence and aggregate caps in any of the triggered policies. That is, to a large extent, these provisions address the same concerns that generally recommend application of the pro rata approach.

By their terms, the Non–Cumulation Provisions apply where "the same occurrence gives rise to personal injury ... which occurs partly before and partly within any annual period of this policy." Similarly, the Prior Insurance Provisions apply where "any loss covered hereunder is also covered in whole in part under any other excess Policy issued to the Insured prior to the inception date hereof." In other words, the Non–Cumulation and Prior Insurance Provisions are designed for a situation in which different policies are responding to the same injury.[165] By their

163. *See, e.g.*, Winsbro Aff. Ex. 12 at VP–EX000812.

164. *See Spaulding*, 819 A.2d at 411 ("[A] noncumulation clause governs successive policies and prevents the accretion of limits when the policies have been triggered by a single occurrence."); OSTRAGER NEWMAN, § 11.02[e] ("Some excess and umbrella contracts contain noncumulation clauses that are intended to reduce the policy limits available to pay a loss by the amount of coverage available from other, prior, insurance.").

165. These Non–Cumulation and Prior Insurance Provisions apply even where multiple insurers are involved. At oral argument, some of the Excess Insurers contended that the Non–Cumulation and Prior Insurance Provisions only applied to an insurer's own prior policies. *Viking Pump, Inc. v. Liberty Mutual Insurance Co. and Warren Pumps LLC*, C.A. No. 1465–VCS, at 141–42 (Del. Ch. Jul. 13, 2009) (TRANSCRIPT). In later briefing, however, some of the Excess Insurers have taken the position that the Non–Cumulation and Prior Insurance Provisions apply regardless of whether the policies involved belong to a single insurer or to multiple. Letter from Neal Levitsky to the Honorable Leo E. Strine, Jr. at 4, fn. 9 (Aug. 3, 2009) ("[Courts] have held that 'Prior Insurance and Non–Cumulation' Provisions such as the ones contained in the First State policies reduce the available limits of coverage under excess policies by all amounts paid under prior policies, irrespective of whether such policies were issued by a different insurance carrier."). New York courts have not examined this particular issue, although a number of opinions have enforced non-cumulation provisions in the single-insurer context. *Hiraldo v. Allstate Ins. Co.*, 5 N.Y.3d 508, 806 N.Y.S.2d 451, 840 N.E.2d 563 (2005); *Endicott Johnson Corp. v. Liberty Mut. Ins. Co.*, 928 F.Supp. 176, 181–82 (N.D.N.Y.1996); *Bahar ex rel. Johnson v. Allstate Ins. Co.*, 2004 WL 1782552 (S.D.N.Y. 2004). In line with our own Supreme Court's opinion on this subject, I conclude that the Non–Cumulation and Prior Insurance Provisions here apply in the multiple-insurer context. *See Hercules*, 784 A.2d at 494. The contractual reason for that conclusion is simple. The Excess Policies are part of a comprehensive, multi-year insurance program. By following form to the Non–Cumulation and Prior Insurance clauses, the Excess Policies are only sensibly read as applying to all prior insurance in the comprehensive program of which the Excess Policies are an integral part.

very presence, they suggest that the words "during the policy period," do not have the drastic effect the Excess Insurers contend for. Rather, the words "during the policy period" simply require that the insured's liability for the claim in question be attributable to an occurrence during the policy period; that is, that the tort plaintiff have suffered an injury in fact during the policy period that has resulted in the insured's liability.

Of paramount importance in deciding this case is the fact that the Non–Cumulation and Prior Insurance Provisions cannot be reconciled with the pro rata method of allocation. Applying those Provisions makes no sense once proration occurs. Under those Provisions as written, in the case of an asbestos plaintiff with Multi-Period Exposure, the plaintiff's injury is treated as indivisible and resulting from one occurrence. After proration, the very premise upon which the Non–Cumulation and Prior Insurance Provisions are based is absent, because there is no common injury. Rather, by proration of some kind, the asbestos plaintiff is deemed to have suffered a bunch of divisible injuries. To illustrate, let us return to our hypothesized tort plaintiff, who has received a $1 million judgment for exposure to asbestos from 1972 to 1982. If, by proration, the $1 million is spread—on some sort of basis—across the whole period, no policy would be covering an injury also covered by another period. For example, if the policy for 1976 covered its pro rata share of the $1 million, it would essentially be covering a separate injury from what the 1977 policy was insuring. In order to apply a Non–Cumulation or Prior Insurance Provision in these conditions, a court would thus have to give an insurer credit for recovery for sums which the insurer's policy was never re-

sponsible, due to proration, in the first place. In other words, use of the pro rata method would render the Non–Cumulation and Prior Insurance Provisions needless.

Put another way, the inclusion of the Non–Cumulation Provisions means that an "occurrence," which is capable of triggering multiple policies, must nevertheless be viewed as causing only a single indivisible injury. To see how this is so, one must examine the interplay of the specific policy language in question. As described above, the definition of "occurrence" in the policies is "injurious exposure to conditions, which results in personal injury." [166] Without the inclusion of the Non–Cumulation Provision in the insurance policy, this definition would allow an insured to claim a *separate* injury in each policy period triggered. In other words, the injury would be divisible. But, the Non–Cumulation Provision applies to "the *same* occurrence [that] gives rise to personal injury." [167] Thus, the Non–Cumulation Provision is only effective if the injury is conceived as indivisible. Pro rata allocation conflicts with this presumption because, by spreading costs so that each policy only pays for injuries that are assumed to have occurred during that policy's period, it treats the injury as divisible. This makes the Non–Cumulation Provision nonsensical because the clause, by its terms, cannot be applied to separate injuries.

The inconsistency of the pro rata method with the Non–Cumulation and Prior Insurance Provisions is made even more clear when one examines what would result if those provisions were applied along with the pro rata approach. Depending upon how they are used to reduce the occurrence limit, application of the Non–Cumulation and Prior Insurance Provi-

166. Winsbro Aff. Ex. 11, at LMVP01214.

167. *Id.* at LMVP01213 (emphasis added).

sions alongside the pro rata approach would unreasonably reduce coverage and grant the insurer a windfall. As discussed above, the Provisions reduce the limits per policy period. When the Provisions are combined with pro rata allocation, the question arises of which limit—the full per-occurrence limit as stated in the policy or the pro-rated limit—is reduced by the Non–Cumulation Provision.[168] Applying the Provisions to reduce the *pro-rated* occurrence limit restricts coverage even further than the limits stated in the policies. For example, in a situation where an insured has multiple years of coverage with a per-occurrence limit of $100,000, application of a non-cumulation or prior insurance provision means that the insured can only recover for one period, or $100,000, for liability to an asbestos plaintiff regardless if the insured is itself liable to the plaintiff for more. The insured cannot stack successive years to increase his recovery above $100,000 to the amount of the judgment against it. If, however, liability has been pro-rated, so that each policy period is apportioned, say, $20,000 of the total judgment, then application of the non-cumulation provision would limit the insured's recovery to $20,000, the pro-rated limit for a single policy period. Courts have aptly described this application of both pro rata allocation and non-cumulation provisions as a "double credit" for insurers.[169]

On the other hand, it is possible to argue that the Provisions reduce the *full* per occurrence limit. This makes no sense, however, because proration has already done so. In other words, if the Non–Cumulation Provision simply reduces the full limit, then it simply replicates what the pro rata allocation already accomplished.

Faced with the arguably bizarre and inequitable results that would result if the Non–Cumulation and Prior Insurance Provisions were applied to the Houdaille Policies, most of the Excess Insurers have disclaimed the effectiveness of the Non–Cumulation and Prior Insurance Provisions, arguing that they would not apply if a pro rata method of allocation was used.[170]

---

**168.** The problem with combining pro rata allocation with Non–Cumulation and Prior Insurance Provisions is that combination either *amplifies* pro rata allocation and the provisions' otherwise independent effects or renders the Provisions *redundant*. Which way the causality tips—to either amplification or redundancy—depends upon which limits, either the full occurrence limits found in the policies or the pro-rated limits, the Provisions apply. To see how this is so, it is necessary to remember that the Provisions reduce "the aggregate limit or limits of this policy ... by the amount of each payment made ... either under a previous policy or policies of which this is a replacement, or under this policy with respect to previous annual periods thereof." Winsbro Aff. Ex. 11 at LM–VP01200. If the Provisions apply to the pro-rated amounts for which each triggered policy is liable, then the above Provisions will reduce the amount owed under each policy even further (see the example in the text of this paragraph). On the other hand, if the Provisions apply to the full per occurrence limits even though the court has already pro-rated liability, then the Provisions are rendered superfluous. That is, reducing the original full per occurrence limits through the Non–Cumulation and Prior Insurance provisions only accomplishes the same thing as proration.

**169.** *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 283 Ill.App.3d 630, 219 Ill.Dec. 62, 670 N.E.2d 740, 750 (1996); *Spaulding*, 819 A.2d at 422.

**170.** Letter from John Spadaro to the Honorable Leo E. Strine, Jr. at 6 (Aug. 3, 2009) ("The Excess Insurers do not contend that the Non–Cumulation or Prior Insurance provisions are applicable to the numerous asbestos bodily injury products claims against Warren and Viking."). Some of the Excess Insurers, however, argue that these Provisions may still apply in the context of a pro rata allocation. Letter from Neal Levitsky to the Honorable Leo E. Strine, Jr. at 1 (Aug. 3, 2009) ("We believe, however, that although unlikely, there may be scenarios in which the Non–Cumula-

That is, the Excess Insurers say that the pro rata method applies even though that requires this court to declare that explicit provisions in the contract are to be without effect.

The conclusion that the Non–Cumulation and Prior Insurance Provisions are inconsistent with pro rata allocation is in line with the precedent on this question. Although no New York court has addressed in any detail whether pro rata allocation can be used with a non-cumulation or prior insurance provision,[171] the other courts that have explicitly addressed this issue have found non-cumulation and prior insurance provisions to be evidence that the

parties did not intend to use the pro rata method of allocation.[172] Specifically, courts have taken one of two approaches, either: (1) finding that, because pro rata allocation is mandated by the law of their state, it applies regardless of the presence of the non-cumulation and prior insurance provisions, but that these clauses cannot be enforced by the insurer along with pro rata allocation because it would be unfair to the insured and give the insurer a windfall;[173] or (2) reading those provisions as evidencing the parties' intention that an all sums method of allocation be used because doing so is the only way to give effect to every provision in the insurance policy.[174]

tion Provision would apply to an asbestos products loss even in a pro rata jurisdiction."). They argue that the Non–Cumulation Provisions in the unexhausted policies of Liberty Mutual, the primary insurer, may operate so that only a single occurrence limit ($250,000) for the same occurrence would apply across the period of unexhausted coverage. *Id.* at 2. The result, they argue, is to shift allocation of part of the loss from the Liberty Mutual primary policies to the excess coverage. *Id.* at 4. Despite assurance that the application of the Non–Cumulation provision "does not create a hole in coverage," the Excess Insurers argument illustrates the danger of "double crediting" insurers through application of a Non–Cumulation provision under a pro rata regime. *Id.* The only thing preventing a "hole in coverage" from opening is the large single occurrence limits under the other Insurers' policies. *See id.* at 3. If those policies had lower limits, then the costs would be passed from one Insurer to another until winding up at the insured's feet.

**171.** Non-cumulation provisions were briefly discussed in one recent unreported New York case. *See Long Island Lighting Co. v. Allianz Underwriters Ins. Co.,* No. 97–604715 (N.Y.Sup.Ct. Dec. 24, 2003). Although the court rejected plaintiff's argument regarding the applicability of the non-cumulation provisions, the court did not provide a reasoned explanation sufficiently transparent to determine whether similar logic applies in this situation.

**172.** Some New York cases have applied non-cumulation provisions to Multi–Period Exposures, but they have done so without explaining the applicable allocation method. The result was that the insured's total recovery was limited to one "per occurrence" limit. *See, e.g., Hiraldo v. Allstate Ins. Co.,* 5 N.Y.3d 508, 806 N.Y.S.2d 451, 840 N.E.2d 563 (2005).

**173.** *E.g., Outboard Marine,* 219 Ill.Dec. 62, 670 N.E.2d at 750 ("To apply the 'prior insurance' and 'non cumulation of liability' clauses would give the insurers a double credit and would deprive the insured of the full value of its premium."); *Spaulding,* 819 A.2d at 422 ("Once the court turns to pro rata allocation, it makes sense that the non-cumulation clause, which would allow the insurer to avoid its fair share of responsibility, drops out of the policy.").

**174.** *E.g., Dow Corning Corp. v. Cont'l Cas. Co.,* 1999 WL 33435067, at *7–8 (Mich.Ct.App. Oct. 12, 1999) (adopting all sums allocation despite Michigan precedent applying pro rata allocation because of a prior insurance provision); *see also Liberty Mutual Ins. Co. v. Those Certain Underwriters at Lloyds,* 650 F.Supp. 1553, 1559 (W.D.Pa.1987) (noting in reference to a Prior Insurance Provision that "[t]here can be no clearer indication that these policies were intended to provide coverage for *all* damages regardless of when they occurred, provided they are derived from the 'occurrence' which triggers coverage. Defen-

Importantly, courts in this second category include our own Delaware Supreme Court, which held that the presence of non-cumulation and prior insurance provisions supported the conclusion that allocation under the underlying policies was to be on an all sums basis. In so holding, the court stated, "[r]ather than giving way to pro rata allocation, [the Non–Cumulation and Prior Insurance] provision undercuts the rationale for pro rata allocation because it provides continuing insurance for ... damage arising out of a continuing occurrence."[175]

It is a fundamental New York rule of contract interpretation that a court should read a contract in order to give full effect to every term therein.[176] The Excess Insurers would have me interpret the Houdaille Policies as embracing the pro rata method of allocation by having me jettison explicitly bargained-for provisions of those Policies *that benefit them*, and therefore reconciling the evident conflict between explicit provisions of the Policies and the pro rata method the Excess Insurers say is implicitly called for by the Policies. In other words, the Excess Insurers would have me elevate their self-interested policy preference over the only method of allocation that permits the sensible operation of all of the Houdaille Policies' material terms. New York law does not permit

such a result but instead requires giving effect to the parties' contractual choice.

Notably, the use of the all sums approach with faithful application of the Non–Cumulation and Prior Insurance Provisions accomplishes many of the same policy purposes as the pro rata method. By their application, those Provisions prevent insureds like New Viking and New Warren from stacking policy limits and reduces their per-tort claimant exposure in a way similar to pro rata allocation. Nor should it be forgotten that the Excess Insurers also benefit from any legal doctrines that limit the insured's liability. To be concrete, to the extent that, for example, New Viking is able (because some jurisdictions have adopted liability-cabining rules or for other reasons) to reduce its own liability to less than joint and several liability for the total harm suffered by an asbestos plaintiff who was exposed to asbestos by New Viking, the Excess Insurers benefit too. When combined with the ability of the Excess Insurers to bargain for total policy and per occurrence policy limits and other liability-limiting features, this reality forecloses any argument that the application of an all sums method of allocation in concert with the Non–Cumulation and Prior Insurance Provisions subjects the Excess Insurers to some unconscionable and unforeseen liability to their insureds.

dants' policies are plainly 'occurrence' policies.").

175. *Hercules*, 784 A.2d at 494.

176. *Hooper Assoc. v. AGS Computers*, 74 N.Y.2d 487, 493, 549 N.Y.S.2d 365, 548 N.E.2d 903 (N.Y.1989) ("We construe the policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect.") (citing *Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 176 N.E.2d 37 (N.Y.1961) ("It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract ... without force and effect.' ")); *County of Columbia*, 612 N.Y.S.2d 345, 634 N.E.2d at 950 ("An insurance contract should not be read so that some provisions are rendered meaningless."); *Consol. Edison*, 98 N.Y.2d at 221–22, 746 N.Y.S.2d 622, 774 N.E.2d 687; *see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 558 (2d Cir. 2000) ("[A]n interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable.").

Most important, the contractual language only works if all sums is the approach. The Excess Insurers bargained for an all sums method of allocation greatly tempered by exposure-reducing Non–Cumulation and Prior Insurance Provisions. They cannot now prospect for more by having a court substitute a different allocation method for that which best fits with all of the terms of the relevant Policies.

## C. The Extrinsic Evidence Supports The Application Of The All Sums Method Of Allocation

 Recourse to extrinsic evidence, were it necessary, would only confirm this conclusion. Under New York law, if an insurance policy is ambiguous, the parties may submit extrinsic evidence to clarify the policy's meaning.[177] Under New York law, the parties' later course of conduct is considered "the most persuasive evidence of the agreed intention of the parties."[178] "Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."[179] To find a practical construction, "there must have been conduct by the one party expressly or inferentially claiming as of right under the doubtful provision, coupled with the knowledge thereof and acquiescence therein, express or implied, by the other."[180] New York case law suggests that the alleged practice must have occurred on more than one occasion.[181]

Here, the only extrinsic evidence that either party has presented is how Liberty Mutual allocated claims.[182] Specifically,

177. *Home Indem. Co.*, 495 N.Y.S.2d 969, 486 N.E.2d at 829 ("If, however, the language in the insurance contract is ambiguous and susceptible of two reasonable interpretations, the parties may submit extrinsic evidence as an aid in construction.").

178. *Fed. Ins. Co. v. Ams. Ins. Co.*, 258 A.D.2d 39, 691 N.Y.S.2d 508, 512 (N.Y.App.Div.1999) (quoting *Webster's Red Seal Publ'ns, Inc. v. Gilberton World–Wide Publ'ns, Inc.*, 67 A.D.2d 339, 415 N.Y.S.2d 229 (N.Y.App.Div.1979)).

179. *Id.* at 512 (quoting *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967, 57 L.Ed. 1410 (1913)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 202(4) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.").

180. *Cont'l Cas. Co.*, 80 N.Y.2d at 651, 593 N.Y.S.2d 966, 609 N.E.2d 506 (internal citations omitted).

181. *See, e.g., City of New York v. New York City Ry. Co.*, 193 N.Y. 543, 548, 86 N.E. 565 (1908) ("When the parties to a contract of doubtful meaning, guided by self-interest, enforce it for a long time by a consistent and uniform course of conduct, so as to give it a practical meaning, the courts still treat it as having that meaning, even if as an original proposition they might have given it a different one."); *see also Miller v. Clary*, 147 A.D. 255, 127 N.Y.S. 897, 901–902 (N.Y.Sup.Ct. 1911); *aff'd*, 147 A.D. 255, 131 N.Y.S. 1129 (N.Y.App.Div.1911), *aff'd as modified*, 210 N.Y. 127, 103 N.E. 1114 (N.Y.1913); *In re Prudential Lines*, 158 F.3d at 78–79 (discussing cases); RESTATEMENT (SECOND) OF CONTRACTS § 202(4) cmt. g. ("The Rule of [§ 202(4) regarding course of performance] does not apply to action on a single occasion.").

182. New Viking and New Warren provide the only extrinsic evidence in regard to this issue. *See* Letter from John James to the Honorable Leo E. Strine (Aug. 3, 2009) at 7–9. Excess Insurers do not dispute the extrinsic evidence provided by New Viking and New Warren. Even though they were given sufficient access to the large number of claims made against the Houdaille Policies over the years, the Excess Insurers have not adduced grounds for a contrary interpretation of how Liberty Mutual allocated claims. *Viking Pump, Inc. v. Century Indem. Co.*, C.A. No. 1465–VCS, at 11:5 (Del. Ch. Feb. 27, 2009) (TRANSCRIPT) (al-

for several years, Liberty Mutual allocated liability from New Warren's policies based on an all sums method which resulted in Liberty Mutual paying more than it would have in a pro rata scheme. Understanding what Liberty Mutual did requires some more background on the asbestos claims and the insurance coverage that covered the Warren Pumps businesses. As indicated above, before those businesses were purchased by Houdaille, they were independent companies themselves that manufactured pumps. And, those pre-Houdaille activities also involved the use of asbestos. It is accordingly unsurprising that New Warren has been sued by plaintiffs for asbestos exposure that began before those businesses were acquired by Houdaille.

The Warren Pumps business was insured with Travelers Indemnity Company from 1969 until 1972, when the business was purchased by Houdaille. This means that an exposure that began during that period and continued into the period of Liberty Mutual's coverage would have triggered not only the Liberty Mutual policies but also the Travelers policies. Initially, Liberty and Travelers shared the costs of New Warren's indemnity.[183] That conduct was consistent with either pro rata or all sums allocation.[184]

But, the Travelers policies had lower aggregate limits and were exhausted before the Liberty Mutual policies.[185] And, there was also no excess insurance above the Travelers policies. Liberty Mutual, however, continued to pay for injuries that occurred during the period that Travelers insured.[186] That point is important because, under a pro rata scheme, Liberty Mutual would not have been liable for any injury that could have been allocated to

---

lowing the Excess Insurers to audit ten percent of the claims under the Houdaille Policies that Liberty Mutual covered); *see also Viking Pump, Inc. v. Century Indemnity Co.,* C.A. No. 1465–VCS, at 34:22 (Del. Ch. Mar. 31, 2009) (TRANSCRIPT). Therefore, New Viking and New Warren's extrinsic evidence need not be submitted to a trier of fact and can be decided as a matter of law at summary judgment. *Uniroyal,* 707 F.Supp. at 1375–76 ("Where the terms of the policy admit of ambiguity, the court should afford the parties an opportunity to adduce extrinsic evidence as to their intent.... This invitation might result in three outcomes under New York law: extrinsic evidence offered that raises a question of credibility or presents a choice among reasonable inferences; extrinsic evidence offered that fails to raise credibility or present such a choice; or no extrinsic evidence offered. New York law requires a submission to the factfinder in the first situation, but a construction by the court as a matter of law in the second and third situations.") (internal citations omitted); *see also Carvel Corp. v. Rait,* 117 A.D.2d 485, 503 N.Y.S.2d 406, 409 (N.Y.App.Div.1986).

**183.** O'Brien Aff. Ex. 9.

**184.** The Excess Insurers have attempted to argue that because Liberty accounted for its payments by allocating the costs to different policy periods it was applying pro rata allocation. Specifically, when paying out on a claim, Liberty Mutual would allocate expenses to each policy that would have responded to the claim in question. McKay Aff. Ex. 14 at 72. But under both all sums and pro rata methods of allocation, costs are allocated among the triggered policy periods, the only difference is whether the insured can claim its full loss on a policy in the first instance. Under the all sums method of allocation, the insurer can bring a claim against other insurers for contribution. *See* HOLMES' APPLEMAN ON INSURANCE 2D § 145.4[A][2][a] (noting that even though under an all sums method of allocation "the insurer or insurers on the risk in the picked year are initially responsible for paying the entire loss, those insurers picked may then seek reimbursement from other triggered policies in a contribution action against other insurers"). Liberty Mutual's allocation of liabilities among the policies it issued is therefore consistent with all sums allocation.

**185.** O'Brien Aff. Ex. 9.

**186.** McKay Aff. Ex. 14 at 75–77.

the Travelers period for which New Warren no longer had insurance.

Like the Excess Insurers, Liberty Mutual had an incentive to push for a pro rata method of allocation, but the only evidence in the record indicates that an all sums approach was utilized. The Excess Insurers signed on to a comprehensive insurance program of excess insurance that follows form to the Liberty Mutual policies and are in no equitable or logical position to now argue for a different allocation method than that which had been applied under the contractual program for many years at the primary level.[187]

As important, the Excess Insurers have not provided any extrinsic evidence suggesting that the Houdaille Policies actually provided for a pro rata method of allocation nor have they indicated that there is any evidence so suggesting. Therefore, the only extrinsic evidence offered tilts toward application of all sums allocation.

D. *Even If The Houdaille Policies Were Ambiguous, The Ambiguity Must Be Resolved Against The Excess Insurers*

Given the length of time that has passed since the various Houdaille Policies were put in place, it is not surprising that the Excess Insurers have not been able to point to any extrinsic evidence that a rational fact finder might use to resolve any ambiguity in the Houdaille Policies regarding the method of allocation be resolved in favor of the pro rata method of application. But, assuming that there was not, as there in fact is, extrinsic evidence weighing strongly in favor of the all sums method, a grant of summary judgment against the Excess Insurers would still be in order.

■ Under New York law, where extrinsic evidence does not clarify an otherwise ambiguous provision in an insurance policy, any ambiguity must be resolved against the insurer.[188] Accordingly, if the extrinsic evidence that has been presented did not render the contract's meaning free from rational dispute, I would in any event have to rule against the Excess Insurers who, had they wished to, could have included in their policies a provision expressly and unambiguously requiring that liability be allocated on a pro rata basis.

In applying this doctrine in the alternative, I am aware of a federal decision refusing to apply the principle in a case where multiple insurers and policies were involved. In *Treadwell*, a case allocating liability under New York law to insurers for personal injury claims arising asbestos exposure, the court declined to apply the *contra proferentum* rule where application of the rule would have affected multiple insurers.[189] The opinion appears to advance two reasons why application of the rule is inappropriate where multiple insurers are involved. First, the court rea-

---

**187.** *See Hartford Accident Indem. Co. v. Pacific Employers Ins. Co.,* 862 F.Supp. 160, 162 (S.D.Tex.1994) ("Follow-form policies extend the limits and operate under the rules of [the primary policy]. Unless there is an express exception to the form of the primary insurance, the excess carrier must act according to the primary insurance policy's terms.")

**188.** *Home Indem. Co.,* 495 N.Y.S.2d 969, 486 N.E.2d at 829 ("[I]f the tendered extrinsic evidence is itself conclusory and will not resolve the equivocality of the language of the contract, the issue remains a question of law for the court. Under those circumstances, the ambiguity must be resolved against the insurer which drafted the contract.") (citation omitted); *Superior Ice Rink, Inc. v. Nescon Contracting Corp.,* 52 A.D.3d 688, 861 N.Y.S.2d 362, 366 (N.Y.App.Div.2008) (resolving an ambiguity against an insurance company on summary judgment where the insurance company failed to present any extrinsic evidence supporting its position).

**189.** *Treadwell,* 58 F.Supp.2d at 103.

soned that the rule has no application to a case involving multiple insurers and multiple insurance contracts where the question to be decided "arises altogether outside the scope of any particular contract."[190] Second, the opinion cites authority that argues that application of the rule to multiple insurers can lead to disparate results, depending upon the particulars of each insurer's policy and situation.[191] Neither reason applies in this case, however, where all of the Excess Insurers' policies "follow form" to Liberty Mutual's primary policy language. First, following form means that *contra proferentum* is not applied abstractly "outside the scope of any particular contract" but, rather, is applied to each and every contract in question. Concrete application of the rule is possible and advisable because the policies are largely the same. Second, this homogeneity, which arises from participating in a common insurance program, also means that the effect of applying *contra proferentum* will be symmetric across the Excess Insurers, as should be expected when parties participate in a common insurance program. Therefore, application of *contra proferentum* works no unfairness because Liberty Mutual had every incentive to draft insurer-friendly terms. Therefore, I see no reason to refuse to apply *contra proferentum* in this case. Indeed, in a situation where multiple insurers sign on to a comprehensive program of insurance that follows form, it would be the failure to provide a consistent interpretation and application that would create the potential for unfairness and inefficiency.

\* \* \*

Accordingly, I find that liability under the Excess Policies is to be allocated on an all sums basis because: i) the policy language, read as a sensible whole, can only be given effect if an all sums approach is used; ii) if there were ambiguity, the only extrinsic evidence of any substance weighs in favor of the all sums approach; and iii) absent any rational basis for a fact-finder to conclude that the Policies can only be reasonably read as embracing the pro rata approach, the ambiguity must be resolved against the insurers and in favor of the insured's position.

## VI. *Conclusion*

For the foregoing reasons, I grant both Viking Pump, Inc.'s and Warren Pumps LLC's motions for summary judgment on the issues of their entitlement to exercise the rights of an insured. I also grant Viking Pump, Inc.'s and Warren Pumps LLC's motion for summary judgment on the issue of allocation. The Excess Insurers' cross-motions for summary judgment are denied. The parties shall craft and submit an implementing order within ten days.

---

190. *Id.*

191. *Id.* (citing Doherty, *supra* note 109, at 268–69; *Owens–Illinois,* 650 A.2d at 991).